In re FEDERAL STORAGE &
MOVING CO., Debtor.

FEDERAL STORAGE & MOVING
CO., Plaintiff,

v.

ALLIED VAN LINES, INC., Defendant.

**Bankruptcy No. 81 B 15738**
**Adv. No. 81 A 4230.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

Sept. 2, 1983.

See also, Bkrtcy., 22 B.R. 15.

---

William F. Conlon, Maureen Walsh, Sidley & Austin, Chicago, Ill., for Allied.

John F. McClure, Chester H. Foster, Jr., Laurence H. Kallen, Arnstein, Gluck & Lehr, Chicago, Ill., for Federal.

## MEMORANDUM AND ORDER

ROBERT L. EISEN, Bankruptcy Judge.

This cause comes to be heard on defendant Allied Van Lines' ("Allied") motion for involuntary dismissal of plaintiff-debtor, Federal Storage & Moving Company's ("Federal") adversary complaint, pursuant to Section 41(b) of the Federal Rules of Civil Procedure. Federal's complaint essentially alleges that the various agreements it had with Allied constituted a contractual relationship and that Allied breached said contract. The court, having heard to conclusion Federal's evidence and having carefully reviewed all of said evidence as well as the memoranda filed and applicable statutory and case law, makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Defendant Allied is a corporation engaged in the business of hauling household goods, etc. on a nationwide basis through numerous contract hauling agents among which was the plaintiff Federal. The essential relationship between Federal and Allied arises out of a "non-carrier" agency contract executed on July 20, 1973. Under said contract, Federal became the agent of Allied entitled to handle moving assignments on behalf of Allied and under Allied's complete and exclusive control. In addition, on that same date, Federal entered into a lease arrangement with Allied and subsequently on July 30, 1973, Federal and Allied entered into an amendment to the agency contract. Pursuant to the agency contract, Allied promulgated rules and regulation to which Federal was subject. In addition Federal, at all times relevant, was a shareholder of Allied and thus Allied's by-laws applied to and affected Federal. Finally, Allied's Board of Directors from time to time approved revisions of the Allied transportation policy, created the concept of a committed fleet and established and revised a seasonal proportionate hauling program.

The rules and regulations promulgated by Allied established a policy whereby Allied's dispatch office, as far as practical, would assign, distribute and route equipment and shipments upon a basis which would reduce empty and light-loaded van mileage. Arti-

cle I, Section (2)(c) of Allied's by-laws provided in part that the company would "seek to foster the interests of the agents in every lawful way, and in a fair and reasonable manner."

The above agreements, rules and regulations and by-laws constituted the contractual relationship that existed between the parties. Allied contracted to employ Federal as its agent to haul shipments on behalf of Allied and as from time to time, directed by Allied. Federal in turn agreed to haul said shipments, commit and lease certain equipment to Allied for this purpose and conform said equipment to Allied's current equipment specifications as well as I.C.C. regulations.

Federal's complaint against Allied involves the years 1975–1979. The conduct that Federal is complaining of did not arise until 1975 when Allied centralized its entire dispatch system. Prior to 1975 Allied's system involved local dispatch offices who would dispatch loads to the various Allied agents. However, in 1975 Allied moved its dispatch operations to Omaha, Nebraska and computerized their system.

After the 1975 centralization of the dispatch system, all jobs booked by Allied's agents as well as by Allied itself went into the central dispatch computer. The computer then would assign the loads to various Allied agents in an effort to fill vans and reduce light and less profitable loads. To obtain a load, an agent would have to have a committed unit * available and so advise Allied. Both Federal and its drivers on the road would contact Allied and advise Allied of its availability to carry a load. Allied's computer would then check for the availability of a load and assign accordingly.

Essentially, from the start of the centralized dispatch system, Federal complained to Allied that it was not getting good and profitable shipments. In fact, the comparative sales and hauling statistical summaries submitted into evidence do indicate that the value of the average long haul shipment hauled by Federal was under that of the other Chicago area Allied agents. However, in examining the statistics in more detail, the following is found:

1. The average value of a shipment assigned to Federal from Allied which Federal did *not* book itself was at or *above* the average for all other Chicago area agents.

2. The average value for a shipment assigned to Federal which *was* actually booked by Federal (self-haul) was *below* that of the average for all other Chicago area agents.

3. The average value of the shipments booked by Federal which *were* actually hauled by Federal was *less* than the average value of those shipments booked by Federal which were assigned by Allied's system to other agents.

4. The average value of the shipments actually booked by other Chicago area agents, whether or not they hauled them, was consistently *higher* than those that Federal was booking.

As a result, the statistics indicate that the disparity between Federal's average line haul and that of Allied's other Chicago area agents stems from the value of Federal's self haul. It is Federal's contention that Allied kept the good hauls that Federal had booked for itself and other agents and only gave back to Federal the less profitable self-hauls. Federal, however, presented no evidence to verify this claim. Only through the court's own examination of the documents submitted, did the court learn that the hauls booked by Federal which were kept by Allied were slightly more valuable than those self-hauled by Federal. However, that examination also revealed that *all* of Federal's bookings, both self-hauled and kept by Allied, were below the average of the total bookings done by other Chicago agents. Also, Federal was permitted to self haul an above average number of bookings in comparison to other Chicago area agents.

In addition to the general assertions by Federal regarding Allied's conduct from 1975–1979, Federal specifically points to the off-season of 1978–1979 as being the most

* A committed unit consists of a truck, trailer and qualified driver.

detrimental to its business. In the 1978–1979 off-season as in many others, Allied instituted a seasonal proportionate hauling program. The program was developed to provide Allied's agents with a right to earn hauling compensation during the off-season (Nov. 1—May 15) in approximate proportion to the hauling compensation earned by the agent in the peak season in ratio to the total of hauling compensation earned by all hauling agents in the preceding peak season. An agent's applicable hauling compensation to be used during the off-season was to be converted to off-season point credits. Off-season tonnage under the program was to be assigned to agents in such a manner as to *attempt* to insure that, at the end of every month, each agent would have used the same approximate percentage of its season's total allotted point credits as any other hauling agent.

In the 1978–1979 off-season Federal had five committed long haul units in the Allied points program. Federal was allocated by Allied a total of 9,245 points. Except for November of 1978, however, Federal did not receive enough business from Allied to use up even 50% of its eligible points. Meanwhile, the other Chicago area agents were receiving a significant percentage of the haulings they were eligible to receive.

Federal's two principle officers and its former mechanic all testified that except for a few brief suspensions they always had tractors, trailers and drivers ready, willing and able to carry loads during the 1978–1979 off season. Federal's officers testified that they contacted Allied a number of times about the lack of assignments and Allied responded that things were slow and there was no business for them.

However, cross-examination disclosed that Federal's real problems in 1978–1979 were more likely in communication or (or lack of it) with Allied's dispatch computer and in its inspection reports in Allied's files. Federal's former mechanic, Mr. Svec, testified that all of the units were inspected whenever necessary and a copy of any inspection report made was sent to Allied. He also testified that he personally kept a copy of the report and Federal also kept one in its file.

Federal's copies of the inspection reports as well as Mr. Svec's copies, however, have been misplaced or lost. At the same time, Allied's files do not reflect that all of the necessary inspection reports were filed in the 1978–1979 off season. In fact on February 6, 1979 Allied sent a letter to Mr. Chambers at Federal which indicated that four out of Federal's five committed vans were out of service for a period of over 30 days and thus had to be removed from the committed fleet. Mr. Chambers does not recall receiving said letter but did admit it was addressed to him at the correct address.

Although various explanations are feasible, it appears that the February 6, 1979 letter was triggered by the fact that Allied's computer showed that no inspection reports had been filed after they were due on four out of Federal's five committed vans. In addition, during the 1978–1979 off season Federal drivers were suspended three times, two drivers left the company before the end of 1978 and one more left in February, 1979.

Finally, as a result of Federal's lack of assignments, for whatever reason, in October or November of 1978 Federal began to show debits on its statements from Allied due to lack of payments on various loans made to Federal by Allied and Allied advised Federal that it could no longer participate in the National Account Financing Program. Also, in February of 1979, Federal was put on C.O.D. status which meant that Federal could not participate in any haulings where there was collection upon delivery. In order to carry a C.O.D. shipment, an agent would have to put up 80% of the value of the shipment in advance of the haul. Eventually, this situation led to Federal having essentially all of its equipment repossessed or sold to satisfy creditors in April of 1979.

## DISCUSSION

It is Federal's contention that the various agreements it had with Allied constituted a contractual relationship and that Allied is

guilty of a breach of that contract. Specifically, Federal contends that Allied had a duty to assign and route equipment and shipments upon a basis which reduced empty and light-loaded vans and could not favor one agent over another when making assignments. Federal alleged that Allied breached its duty in the following ways: 1. During the 1975–1979 peak season, Allied favored other agents over Federal; 2. During the 1975–1978 off-seasons, Allied tendered far fewer hauling assignments to Federal than Federal was entitled to receive by virtue of the points program set up, in spite of the fact that Allied could have made a sufficient number of such assignments to Federal for which it was eligible; and 3. That during the 1978–1979 off-season Allied was contractually bound to tender hauling assignments so as to produce approximately the number of points allocated to Federal and did not do so. Federal contends that it was ready, willing and able to accept hauling assignments for all of the relevant periods in question and that as a direct result of Allied's preference of other agents over Federal, Federal suffered a severe drop in revenue, lost drivers, had equipment repossessed and was eventually forced to cease operations entirely.

Additionally, Federal in its response to Allied's Section 41(b) motion, for the first time, asserted that Allied may have violated the Illinois Franchise Disclosure Act or the Automobile Dealer's Day in Court Act. The court, however, does not view either act as applying in this case.

Section 41(b) of the Federal Rules of Civil Procedure states in relevant part that "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal *on the ground that upon the facts and the law the plaintiff has shown no right to relief.*"

There is no dispute as to the purpose of a section 41(b) motion or the standards the court must use to decide the motion. The idea behind a Section 41(b)

motion is that the plaintiff had a full and fair opportunity to present his case and has simply shown no right to relief. In deciding a Section 41(b) motion, a court must view the evidence in an unbiased way and accord it such weight as the court believes it is entitled to receive. *Sanders v. General Services Administration,* 707 F.2d 969 (7th Cir.1983); *Patterson v. General Motors Corp.,* 631 F.2d 476 (7th Cir.1980); *Allred v. Sasser,* 170 F.2d 233 (7th Cir.1948). Where plaintiff's evidence is conflicting or presents questions of creditability, the judge must evaluate the testimony and decide how to weigh such conflicts of evidence or assess the creditability of such evidence. *Gary Theatre Co. v. Columbia Pictures Corp.,* 120 F.2d 891 (7th Cir.1941). The court may not consider the evidence in the light most favorable to the plaintiff. *Sanders,* supra, *James Burrough Ltd. v. Sign of Beefeater, Inc.,* 540 F.2d 266 (7th Cir.1976).

The question for this court to resolve, therefore, is whether or not the evidence establishes a right to relief on Federal's claim. It is essentially Federal's contention that it had a contractual relationship with Allied and Allied breached its duty under that contract. Allied claims that the agreements between the parties do not constitute a contract. The court without going into detail finds that a contractual relationship between the parties did exist. However, the duty of Allied under said contract was not as Federal would have the court believe. Allied was not obligated to specifically guarantee a certain number of shipments to Federal either during the peak or off seasons. Instead, Allied was simply liable to foster the interests of each of its agents in every lawful way and treat each agent in a fair and reasonable manner when assigning shipments thereto.

In deciding whether or not Federal has shown a right to relief for its claim, the court must examine the evidence to determine whether or not Federal made a showing as to breach of duty by Allied and resulting liability. It is Federal's contention that from 1975–1978 Allied discriminated against Federal in its hauling assign-

ments. Specifically, Federal contends that Allied took the better hauls that Federal booked and assigned them to other Allied agents and only allowed Federal to self-haul the less valuable loads. The evidence reveals that Federal's average line haul each year was indeed less than that of other Chicago area agents. An examination of the breakdown of this statistic indicates that the value of Federal's self-haul is the reason for their lower average line haul. The statistics do indeed reveal that the bookings of Federal kept by Allied were slightly more valuable than those it allowed Federal to self-haul. However, those statistics also reveal that Federal was allowed an above average number of self-hauls but that both the bookings it self-hauled and those kept by Allied were below the average of those booked by all other Chicago area agents.

Federal presented no evidence to indicate that Allied acted in bad faith or was guilty of unfair dealing. In fact, if the court had not on its own examined in detail the Comparative Sales and Hauling Statistical Summaries it would not have known that the values of the Federal bookings kept by Allied were slightly higher than those it allowed Federal to self-haul. However, this fact alone does not prove any culpable conduct on the part of Allied. While Federal would have the court believe that Allied purposely kept all of the good hauls for itself, the court could just as easily come to the conclusion that Federal booked below average business and no matter how hard Allied tried to give Federal bookings from other agents which were valuable, Federal's own poor business practice and bookings dragged the company down. Allied could have actually taken some of Federal's valuable bookings and assigned them to others because of where and when there were vans to fill and in exchange given Federal even more valuable bookings.

The above possible explanation for what happened with Federal's business is just as feasible as Federal's contention of wrongdoing on the part of Allied. In order to overcome the granting of a 41(b) motion, Federal must show facts and proof to substantiate its claim against Allied. However, the evidence does not reveal facts from which the court could draw the conclusion that Allied was guilty of any specific conduct which adversely affected Federal's average line haul.

As far as the off season 1978–1979 goes, the evidence clearly indicates that except for November of 1978 Federal received substantially less business than it was eligible to receive under the points program. Federal asserts that Allied was contractually liable to provide Allied with enough shipments to utilize all of its points. Furthermore, Federal asserts that it was ready, willing and able at all times to carry loads for Allied.

However, the Seasonal Proportionate Hauling Program Bulletin which constituted the specific contractual relationship with Federal for the off season, however, did not constitute a guarantee that Federal would receive all of the points allocated to it. Instead the program simply gave a right to Federal to earn hauling compensation during the off season in proportion to that it earned during the peak season. Allied still needed loads to assign and Federal needed to have eligible units available to haul such loads.

Federal's witnesses testified that they had drivers and vans ready and willing at all times to haul loads during the 1978–1979 off season. Federal's mechanic testified that he made all inspections necessary and directed that said inspection reports be sent to Allied. However, Federal's copies of said reports have apparently been misplaced or lost and the evidence clearly showed that Allied and more importantly Allied's central dispatch computer did not know that four out of Federal's five vans were available and properly inspected. Allied's files, in fact, showed that one unit's reports lapsed in July 1978, another in October 1978 and a third in December 1978. In addition, during the same off season period, the records indicated that Federal had drivers suspended three times, two drivers left the compa-

ny before the end of 1978 and one more driver left in February 1979.

It is Federal's position that Allied in the off-season 1978–1979 willfully refused to load Federal's vans and in so doing breached its duty to Federal. The evidence, however, does not substantiate Federal's claim. While Federal's explanation for why it did not get loads in the off season is one possibility no evidence has been presented to substantiate said claim. In fact, the evidence reveals that as far as Allied's computer goes, Federal was not ready or able to accept loads to haul.

Therefore, Federal has presented no evidence to indicate that Allied knowingly or willfully breached their duty under the off-season points program. In addition, Federal's attempt to dismiss the importance of the missing inspection reports is a weak one. Federal states that although I.C.C. rules prohibit uninspected vehicles or drivers from hauling, they do not prohibit Allied from directing that an inspection be made so an assignment may be made. Mr. Chambers testified that on occasion Allied would contact Federal and tell them to get a unit inspected because they had an assignment for it. However, whether or not this was the case after Allied centralized and computerized its dispatch system is unclear. How Allied's computer dealt with these situations is also unclear. The court concludes that there is insufficient evidence to show liability on Allied's part for the great decline in business in the 1978–1979 off-season.

## CONCLUSIONS OF LAW

■ Section 41(b) of the Federal Rules of Civil Procedure provides that a defendant after a plaintiff has completed its presentation of evidence in a non-jury trial, may move for dismissal of the case on the ground that upon the facts and the law the plaintiff has shown no right to relief. In deciding a Section 41(b) motion, a court must view the evidence in an unbiased way and accord it such weight as the court believes it is entitled to receive.

Federal's claim against Allied is essentially one for simple breach of contract. Federal had the burden of proving that: 1. A contract existed; 2. Under said contract Allied owed Federal a certain duty; 3. Allied through no fault of Federal's, breached that duty; and 4. As a result of Allied's breach, Federal was injured.

While a feasible argument was made by Allied as to the lack of a contractual relationship the court in examining the documents does find a contractual relationship existed. Under said contractual relationship, the parties mutually promised to use good faith in interpreting their agreements and good faith and fair dealing in carrying out their purposes. However, in interpreting said agreements, the court comes to the conclusion that the duty Allied owed Federal did not extend so far as to guarantee Federal a certain number or value of loads during the peak or off-seasons. Allied was only liable to use its best efforts to provide business to Federal and all other agents in a fair and reasonable manner.

The essential proof that was missing from Federal's case is that indicating a breach of Allied's duty to Federal under their contractual agreements. While Federal did prove that its business from 1975–1978 was not as good as that of its fellow Chicago agents and that its business declined drastically in the 1978–1979 off season eventually leading Federal to cease operations, Federal did not prove that it was a breach of duty on the part of Allied which was responsible for the situation.

Therefore, Federal did not prove the essential elements necessary to establish a breach of contract claim or entitlement to relief under its claim on any other theory of law. As a result, Allied's Section 41(b) motion must be granted.

WHEREFORE, IT IS HEREBY ORDERED that Allied's motion under Section 41(b) of the Federal Rules of Civil Procedure is granted and Federal's complaint is dismissed.