### In the Matter of Norbert F. TADYCH, Florine Tadych, Debtors.

#### Ronald E. BAKER and Linda B. Baker, Plaintiffs,

#### v.

#### Norbert F. TADYCH and Florine Tadych, Defendants.

#### Bankruptcy No. 85–04562. Adv. No. 86–0204.

#### United States Bankruptcy Court, E.D. Wisconsin.

#### July 19, 1988.

Patrick A. Dewane, Jr., Dewane, Dewane, Kummer & Lambert, Manitowoc, Wis., for defendants.

Terrance L. Farris, Clayton, Mo., for plaintiffs.

## MEMORANDUM DECISION

C.N. CLEVERT, Chief Judge.

Plaintiffs commenced this adversary proceeding against the debtors/defendants to have the court determine whether an alleged debt is nondischargeable under 11 U.S.C. § 523(a)(6). Plaintiffs tried their case to the court after their request for a jury trial was denied and at the conclusion of their case-in-chief, the defendants moved to dismiss. Now, for the reasons stated herein, the defendants' motion is granted, and the plaintiffs' complaint shall be dismissed.

## FACTS

Plaintiffs, Linda and Ronald Baker, were self-employed independent operators of a semi-tractor trailer. The debtors, Norbert and Florine Tadych, were in the same business and owned more than one truck. The plaintiffs and debtors met in 1979, and the plaintiffs were hired by the debtors to drive one of their trucks. At that time, the parties were trucking for a business known as Tri–State Motor Transit Company. Subsequently, the parties left Tri–State and began trucking for Home Transportation Co., Inc. ("Home").

In 1981, the debtors purchased a 1981 Kenworth K–100 truck, and the plaintiffs continued as drivers. Home's standard procedure in dealing with independent truckers was to pay the owners upon completion of a trip. However, to reduce the need for the Bakers to advance expenses and to wait for reimbursement, the debtors persuaded Home to advance a percentage of the trip charge to the driver and to pay the remainder to the debtors. As this was

still inadequate to meet the Bakers expenses, the Bakers and the Tadychs executed a document known as the "General Power of Attorney and Security Agreement." This document, the text of which is attached hereto, stated that the Bakers were appointed as the Tadych's attorneys-in-fact; that the Bakers were authorized to perform certain acts and duties arising from or related to the Kenworth truck which the Bakers had been operating for the Tadychs, provided that the Bakers met certain conditions, among which were making the Tadychs' truck payments for 47 months and paying the Tadychs an additional $500 per month for 40 months. The document further provided that the Bakers would be granted full possession of the vehicle after the final payment was made and that all legal rights and powers would be revoked and the vehicle would revert to the Tadychs if all conditions were not met.

The Bakers alleged that they were purchasing the truck and that they met all of the requirements of the agreement. On the other hand, the Tadychs characterized the agreement as entitling the Bakers only to the use and possession of the truck. Despite this conflicting testimony as to the full intent of the parties in executing this document, it was clear that the document enabled the Bakers to deal directly with Home and to receive full payment for each load that they hauled with the truck.

On October 21, 1981, the debtors notified Home that they were revoking the Power of Attorney, that they were cancelling the Security Agreement, and that the Bakers no longer had the right to drive the truck. In response, Home refused to allow the Bakers to continue hauling, whereupon the Bakers ceased making further payments to the debtors. Eventually the truck was repossessed by the secured party.

The Bakers claimed that the Power of Attorney and Security Agreement was wrongfully revoked by the debtors and that they were damaged by their loss of business and loss of the truck. They further alleged that the Tadychs converted the truck by causing or allowing its repossession by the secured creditor. Finally, they requested a finding that the resulting damage was nondischargeable under 11 U.S.C. § 523(a)(6). Additional facts will be set forth in the decision.

## DECISION

1. *Jurisdiction.* The debtors questioned whether the plaintiff proved that they were entitled to $10,000 in damages in order to maintain a diversity action under 28 U.S.C. § 1332. In view of this argument, it was apparent that the defendants failed to recognize that this is not a diversity action before a United States District, but a core bankruptcy proceeding in which bankruptcy court jurisdiction is based on 28 U.S.C. § 1334, 28 U.S.C. §§ 157(b)(1), (b)(2)(I) and 11 U.S.C. §§ 523(a)(6) and (c). Because there need not be any other ground for jurisdiction, the defendants' jurisdictional arguments for dismissal were without merit.

■ 2. *Jury Trial.* After this case was called for trial, the court ruled that the Bakers were not entitled to a jury trial in this action. While the Bakers' allegations were in the nature of tort and contract actions, which traditionally provide the plaintiff with a right to a jury trial, the central claim was one of dischargeability. A determination of dischargeability is a core proceeding. 28 U.S.C. § 157(b)(2)(I). Core proceedings are a codification of equitable proceedings traditionally falling within the summary jurisdiction of the bankruptcy court, and as such, there is no right to a trial by jury. *In re Baldwin–United Corp.,* 48 B.R. 49 (Bankr.S.D. Ohio 1985), citing *Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966). Furthermore, the seventh amendment to the United States Constitution provides for a right to trial by jury "in suits at common law." U.S. Const. amend. VII. Because determining dischargeability is not a matter of common law, the plaintiff is not entitled to trial by jury. *See* Hogan, *The Availability of Jury Trials in Bankruptcy Courts,* 4 Bankr.Dev.J. 257 (1987). Even though questions of state common law and bankruptcy law may be addressed in an adversary proceeding, the merger of

such questions into a single bankruptcy action results in the case being decided under equitable jurisdiction. *Huffman v. Perkinson (In re Harbour)*, 840 F.2d 1165 17 Bankr.Ct.Dec. 369 (4th Cir.1988), (citing *Katchen*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966)).

An action by a creditor to determine non-dischargeability of a claim against a debtor based on state law is distinguishable from an action in which a trustee is the plaintiff and is attempting to recover funds for the bankruptcy estate. *See, e.g., In re Reda, Inc.*, 60 B.R. 178 (Bankr.N.D.Ill.1986); *In re American Energy, Inc.*, 50 B.R. 175 (Bankr.D.N.D.1985). The former requires a determination of bankruptcy law for final disposition; the latter requires only a determination of state law rights for final disposition. The former arises under Title 11 because the question of dischargeability would not exist absent the bankruptcy; the latter is a "related" case. 11 U.S.C. § 157(c). If the related proceeding has independent nonbankruptcy grounds for federal jurisdiction, the bankruptcy court may hear the case and submit proposed findings of fact and conclusions of law to the district court which shall make the final disposition. *Id.* Unless the parties consent, however, it would not promote judicial economy for the bankruptcy court to hold a jury trial when the issue may be tried de novo with another jury in the district court. *In re Reda*, 60 B.R. at 182. If there would be no independent grounds for federal jurisdiction absent the bankruptcy, the court should abstain. 28 U.S.C. § 1334(c)(2).

3. *Choice of Laws.* The Bakers' claims against the Tadychs were based on a right to recover under state law. *See* 11 U.S.C. § 101(4). The federal question of dischargeability only arises if the debtors' liability is established. Therefore, at the outset, the court had to decide which state laws applied to this transaction.

The "General Power of Attorney and Security Agreement" was executed in Missouri by parties residing in Wisconsin and Illinois. The alleged breach of the "Agreement" took place in Wisconsin and was communicated to Home at its headquarters in Georgia.

■ When litigation involves multi-state contacts, it is necessary to balance the potentially different policies and interests of the states affected. When there is no statutory directive concerning choice of laws in the forum state, or when the intent of the parties is not clear, the factors used in determining the applicable rule of law include the following:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

RESTATEMENT (SECOND) CONFLICT OF LAWS § 6 (1971).

Of the foregoing factors, the key factor for consideration here was the policy of the forum state. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Wisconsin adopted the substance of the choice of laws considerations in *Heath v. Zellmer*, 35 Wis.2d 578, 151 N.W.2d 664 (1967). In doing so, the Wisconsin Supreme Court noted that the "choice influencing considerations" include predictability of results, maintenance of interstate order, simplification of the judicial task, advancement of the forum's governmental interest and application of the better rule of law. *Heath*, 35 Wis.2d at 596, 151 N.W.2d at 672. All of these elements are grounded in the fundamental concept of fairness.

According to the "grouping of contacts" or "center of gravity" approach followed in Wisconsin and set forth in § 188 of the Restatement (Second) Conflict of Laws (1971) (*See also, Haines v. Mid–Century*

*Insurance Co.*, 47 Wis.2d 442, 177 N.W.2d 328 (1970); *Urhammer v. Olson*, 39 Wis.2d 447, 159 N.W.2d 688 (1968)) the factors to be weighed, depending on their relative importance in a particular case, include the place that the contract was entered into, the place of negotiation, the place of performance, the location of the subject matter, the domicile or place of business of the parties and similar relevant factors.

■ The parties in this action met when they were all working in Missouri and the truck was purchased by the debtors and delivered to the plaintiffs in Missouri. Although the parties lived in other states, the essence of the working relationship giving rise to the relevant events was in Missouri. The location of Home Transportation's main office was not relevant here because the central dispute is between the plaintiffs and the debtors. As a result, Missouri was found to be the "center of gravity" of this dispute. Accordingly, Missouri law was applied.

4. *Merits.* Bankruptcy Rule 7041, which incorporates Rule 41 of the Federal Rules of Civil Procedure, provides that a plaintiff's case may be involuntarily dismissed at the close of plaintiff's case if upon the facts and law the plaintiff has shown no right to relief. Bankruptcy Rule 7041(b). Although the plaintiffs advanced a number of interesting theories of recovery, the evidence presented by plaintiffs was insufficient to support any of those theories. *See In re Federal Storage & Moving Co.*, 32 B.R. 659 (Bankr.N.D.Ill. 1983).

■ As one theory of recovery, plaintiffs alleged that the debtor's revocation of the "General Power of Attorney and Security Agreement," and their notification of Home that this had taken place, constituted tortious interference with a contract between the plaintiffs and a third party. The only evidence they presented to support the existence of such a contract was the vouchers showing payment by Home to the plaintiffs for various trips. This evidence showed only that there were many contracts in the past for which Home paid the Bakers. Each time the Bakers hauled a load to its intended destination upon instructions from Home, there was a contract for that particular trip. However, that was not evidence of an ongoing contract with which the Tadychs interfered. The court found that those were trip leases, and that there was no contract between Home and the Bakers for future work.

The plaintiffs next argued that they had a protected "reasonable expectancy of commercial relations" with which the debtors interfered. *Downey v. United Weatherproofing, Inc.*, 363 Mo. 852, 253 S.W.2d 976 (1953). Such an expectancy is not accorded the protection due a contract right, but under Missouri law the prospect of future business relations is entitled to "some" protection. *Id.* The elements of the tort are as follows:

(1) A contract or a valid business relationship or expectancy (not necessarily a contract);

(2) Defendant's knowledge of the contract or relationship;

(3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;

(4) The absence of justification; and,

(5) Damages resulting from defendant's conduct.

*Salomon v. Crown Life Insurance Co.*, 536 F.2d 1233, 1238 (8th Cir.1976) (citations omitted).

The plaintiffs must provide substantial evidence supporting each element of the cause of action. *Francisco v. Kansas City Star Co.*, 629 S.W.2d 524, 529 (Mo.App. 1981). If the plaintiffs can prove each element, then the burden of persuasion shifts to the defendants to justify their actions or to show why the conduct was privileged. *Id.*

■ In this case, the plaintiffs did not meet their burden of proof. The first element of the tort of interfering with a valid business expectancy requires identification of the relationship that is entitled to protection. Was the business relationship between Home and the Bakers, as the plaintiff contended or was the relationship between Home and the Tadychs? It ap-

peared from the behavior of all parties that the business relationship was between Home and Tadych and that the Bakers simply worked for the Tadychs.

Ronald Baker testified as to events surrounding the revocation of the power of attorney which resulted in the Bakers not being able to haul for Home. According to his testimony, Mr. Tadych asked him to drive for another company. Baker refused to do so. He stated that this was because he did not know how much money was involved, and that the new company was farther north. Baker stated: "He just said he was going to go with another company. This was the time he pulled the lease, forced me home; he was working for another company, only had room for him. I said I was satisfied with Home, 'I'm going to stay with Home,' like I said, unless something could be proven to me that there would be a lot more money, then I would consider it." Baker obviously believed that the agreement under which he worked was between Tadych and Home. Later, he stated that he had an attorney write to the Tadychs "to try to get Tadychs in some manner to put, to reinstate the lease with Home Transportation so I could go back to work." This confirms Baker's understanding that he had no business relationship with Home independent of the Tadychs.

Norbert Tadych's revocation of the power of attorney by notifying Home indicates that Tadych also believed there was an ongoing relationship between himself and Home. Home likewise reacted consistently with this theory in forcing Baker to stop hauling. Baker, therefore, had no protected relationship with Home. Furthermore, because Tadych did not breach a contract with Home by terminating the at will arrangement, Tadych was legally justified in that act. *Landess v. Borden, Inc.*, 667 F.2d 628 (7th Cir.1981).

■ The plaintiff next argued citing *Scott v. Hall*, 177 Or. 403, 163 P.2d 517 (1945) that the "General Power of Attorney and Security Agreement" operated as an equitable assignment of the contract between Home and the Tadychs. Although the general rule is that a power of attorney is revocable at will, *Scott v. Hall* recognized an exception which says that a power of attorney granted to another to collect a particular fund is irrevocable if the one receiving the power of attorney also acquires an interest in that fund. *See also, Arcweld Manufacturing Co. v. Burney*, 12 Wash.2d 212, 121 P.2d 350 (1942). But an interest in a fund is distinguishable from an interest in fund proceeds, for example, being paid from a fund for services rendered as an agent. As the court observed in the *Arcweld Manufacturing* case, "it is necessary that the 'interest' be in the subject matter of the power, and not merely in that which is produced by the exercise of the power, for, if the agent's interest exists only in the proceeds of the execution of the power, the interest comes into being only after the power is exercised and extinguished, and hence the two are never united." 12 Wash.2d at 223, 121 P.2d at 355.

The Bakers did not prove that the "General Power of Attorney and Security Agreement" operated as an assignment, either equitable or express. To constitute an equitable assignment in this case, the parties must have intended to transfer a present interest in the Tadych/Home arrangement. But this court could not infer such intent. *See National Refining Co. v. McDowell*, 201 S.W.2d 342 (Mo.1947). On the contrary, all parties, including Home, treated the business relationship between Tadych and Home as ongoing. At most, the Bakers were subcontractors or employees of the Tadychs, entitled only to being paid from the revenues generated by the Home/Tadych agreement. They did not succeed to the Tadychs' position. *See Arcweld Manufacturing, supra* (power of attorney granted to subcontractor was not coupled with an interest); *Beebe v. Columbia Axle Co.*, 233 Mo.App. 212, 117 S.W.2d 624 (1938) (power of attorney granted to at will employee was not coupled with an interest). *See also* Annotation, *What Constitutes Power Coupled with Interest within Rule as to Termination of Agency*, 28 A.L.R.2d 154 (1981).

■ Plaintiffs also alleged that the debtors converted the truck because revocation of the "General Power of Attorney and Security Agreement" set the wheels in motion leading to the eventual repossession of the truck by the secured creditor. This may have been the least tenable of plaintiffs' theories. Conversion requires the wrongful misappropriation of something belonging to another. *Boyd v. Wimes*, 664 S.W.2d 596, 598 (Mo.App.1984). The Tadychs took nothing from the Bakers. The secured creditor lawfully repossessed the truck without assistance from the Tadychs. Hence, there was no conversion.

A knottier problem was considered in determining if there was a breach of contract between the parties. The "General Power of Attorney and Security Agreement" was a prime example of a homemade legal product created in the total absence of legal expertise. As a comprehensive document, it was incomprehensible. It appeared to create several different kinds of rights, some of which were mutually exclusive. First, it appeared to be an ordinary, revocable-at-will power of attorney allowing the Bakers rights to the following:

> [T]o exercise or perform any act, power, duty, right and or obligation whatsoever that we now have, or may hereafter acquire the legal right, power, or capacity to exercise or perform in connection with, arising from, or relating to 1981 Kenworth K–100 Serial Number 1XKKDN9X8BJ290225 with the following conditions: (1.) *To receive and collect any and all revenues from any and all leasse* [sic] *or contracts*. To sign any and all leases and contracts. (Emphasis in original.)

This would allow the Bakers to collect whatever the Tadychs were entitled to under the Tadych/Home agreement and to account to the Tadychs for these receipts. Such a power gives the attorney in fact no beneficial interest in amounts received.

However, the agreement went on to give the Bakers the following obligation:

> (2.) To make all truck payments, 1st. payment $1627.94 followed by 47 installments of # 1593.00 by the 20th. of each month; with an additional 40 payments of $500.00 to Norbert and Florine Tadych. *Note:* Upon last and final payments Ronald and Linda Baker will take full possession of said vehicle free and clean [sic]. (3.) Ronald and Linda Baker will assume all responsibilities to insure the said vehicle is maintained in a like new condition at all times; and that said vehicle is properly insured for collision and liability and property damage; and will assume all costs of operation to include Federal Roaduse [sic] Tax, Fuel Tax, Tags, and maintance [sic] cost.

Requiring the Bakers to make payments to the lienholder and to maintain the truck was consistent with a power of attorney reserving all beneficial interest in the truck and its use to the Tadychs. Mr. Tadych testified that he revoked the power of attorney because he thought he and the Bakers would make more money from the truck. He thereby supported the power of attorney theory.

But where did the $500 payment fit in this theory? The agreement then began to look like a truck lease wherein the Bakers kept all profits from the use of the truck and made set payments to the Tadychs. There was testimony from Mr. Baker to the effect that only the set payments were required. Norbert Tadych had signed a memorandum stating that the truck was being sold to the Bakers, although he claimed this was to allow the Bakers to get a credit card. If the Bakers' theory was correct, the agreement was either a lease with an option to buy or a contract for sale.[1]

■ In the final analysis, it made no difference in determining dischargeability whether Mr. Tadych was exercising a law-

---

1. The final paragraph was consistent with a contract for sale:

> For any reason the payments are not made and/or the conditions are not met, the for said vehicle will revert back to Norbert and Florine Tadych in the same condition it was in at the time it was picked up by Ronald and Linda Baker and all legal rights and powers will be revoked by us in writing.

ful right to revoke a power of attorney or whether he breached a lease, contract for sale or assigned business agreement. Under any tort or contract theory, the Bakers failed to present evidence that Norbert Tadych's act was malicious, as is required to find nondischargeability under 11 U.S.C. § 523(a)(6). While the act was unquestionably willful, there was no proof that Mr. Tadych intended any harm to come to the Bakers or that he knew that harm would result from the revocation. *In re Nelson*, 35 B.R. 765 (Bankr.N.D.Ill.1983). Both Mr. Tadych and Mr. Baker testified that the revocation was done so that the Bakers and the truck could work for another company for more money, and Baker refused to go with the new company on account of insufficient information. This court could not construe such motivation as malicious.

Finally, the Bakers fell far short of proving any damage caused by Tadych's revocation. By refusing to work for Tadych's new company, Baker exacerbated his own situation. He was not prevented from working for another trucker for Home, and he did so for a short period. If Baker had or could establish a relationship with Home, there was no evidence that he attempted to mitigate his damage by leasing another truck.

Certainly the price of the truck was not the damage. The Bakers did not lose a truck, they lost the right to buy a truck for the amount of the remaining payments. Because the Bakers made payments for seven months, they would owe 41 payments of $1,593, plus 33 payments of $500, for a total of $81,813. Baker estimated the value of the truck at $67,000. Time and interest rates for financing would affect whether the value and total payments were equivalent; nonetheless, it appeared that the Bakers' injuries resulting from loss of the truck was negligible at best.

The Bakers argued that the profits earned while operating the trust were a basis for measuring damages. Consequently, the Bakers figured damages by taking the average monthly profit for the seven months they used the truck multiplying the number of months between revocation of the "agreement" and trial, then subtracting the amounts earned at other jobs. Such an extrapolation was purely speculative, unsupportable and overreaching.

This decision shall constitute the court's findings of fact and conclusions of law under Bankruptcy Rule 7052. An order will be entered dismissing the plaintiffs' complaint, with prejudice, and granting debtors' discharge of any liability to the plaintiffs.

April 5, 1981

### General Power of Attorney and Security Agreement

Know all men by these presents, that I Norbert E. Tadych and Florine Tadych, the undersigned, of 15820 Center Rd. P.O. Box 277, Cleveland, Wisconsin 53015, County of Manitowoc, State of Wisconsin hereby make, constitute and appoint *Ronald Baker* and *Linda Baker* of Granite City, Ill. Our true and lawful attorneys in fact for us and in our name, place, and stead, and on our behalf, and for our use and benefit; and Security Agreement.

To exercise or perform any act, power, duty, right and; or obligation whatsoever that we now have, or may hereafter acquire the legal right, power or capacity to exercise or perform in connection with, arising from, or relating to 1981 Kenworth K–100 Serial Number 1XKKDN9X8BJ290225 with the following conditions: (1.) *To receive and collect any and all revenues from any and all leasse or contracts.* To sign any and all leases and contracts. (2.) To make all truck payments, 1st. payment $1627.94 followed by 47 installments of # 1593.00 by the 20th. of each month; with an additional 40 payments of $500.00 to Norbert and Florine Tadych.

*Note:* Upon last and final payments Ronald and Linda Baker will take full posession of said vehicle free and clean. (3.) Ronald and Linda Baker will assume all responsibilities to insure the said vehicle is maintained in a like new condition at all times; and that said vehicle is properly insured for collision and liability and property damage; and will

assume all costs of operation to include Federal Roaduse Tax, Fuel Tax, Tags, and maintance cost.

For any reason the payments are not made and/or the conditions are not met, the for said vehicle will revert back to Norbert and Florine Tadych in the same condition it was in at the time it was picked up by Ronald and Linda Baker and all legal rights and powers will be revoked by us in writing.

Norbert and Florine Tadych
Grantor

Before me, the undersigned, a notary public in and for said County and State of this *6th* day of *April* 1981 personally appeared *Norbert F. Tadych, Florine Tadych, Ronald E. Baker, Linda B. Baker* to me. Known to be the identical persons who executed the within and foregoing instrument, and acknowledged to me that they executed the same as their free and voluntary act and deed for the uses and purposes therein set forth.

In witness where of, I have here unto set my hand and official seal the day and year last above written.

_____
Notary Public

My commission expires 10–2–82.

Seal