**WASHINGTON MEDICAL CENTER, INC., et al., Appellants,**

v.

**Henry C. HOLLE, et al., Appellees.**

**Henry C. HOLLE, et al., Appellants,**

v.

**WASHINGTON MEDICAL CENTER, INC., et al., Appellees.**

**Nos. 88–1205, 88–1285.**

District of Columbia Court of Appeals.

Argued Jan. 17, 1990.

Decided May 3, 1990.

---

1270

Paul R. Webber, IV, with whom Steven
D. Cundra, Rochelle M. Hindman, and Pa-
tricia L. Taylor, Washington, D.C., were on
the brief, for appellants/cross-appellees
Washington Medical Center, Inc. and H.
Charles Deyerberg.

Warren K. Kaplan, with whom Douglas
B. Mishkin, Washington, D.C., was on the
brief, for appellees/cross-appellants Henry
C. Holle and Clyde M. Vernon.

Before ROGERS, Chief Judge, and NEWMAN and FARRELL, Associate Judges.

FARRELL, Associate Judge:

This appeal and cross-appeal arise from the trial court's judgment, following a bench trial, for punitive and compensatory damages against Washington Medical Center (WMC), the managing general partner of an ill-fated limited partnership formed for the purpose of developing certain real property, and its president, Deyerberg, for breach of fiduciary duties to the other partners, including Holle. WMC filed for bankruptcy when the joint venture went awry, and that fact gives rise to two of its primary claims on appeal. It contends that when it filed its bankruptcy petition and was made a "debtor-in-possession" by the bankruptcy court, that status extinguished any fiduciary duties it owed to the other partners and any liability under state law for breach of those duties. WMC also contests the trial court's refusal to apply principles of *res judicata* and collateral estoppel to bar Holle from litigating issues and claims addressed in WMC's bankruptcy proceeding. It further challenges the award of punitive damages, asserting that the court erred in finding that WMC's filing of an action for an accounting and winding up of partnership affairs, naming as defendant Holle but none of the other partners, was a breach of fiduciary duty and part of a pattern of willful misconduct toward Holle. On his cross-appeal, Holle asserts that the court erroneously denied his claim against WMC for certain rental payments for real property owned by the partnership stemming from WMC's status as assignee of the leasehold.

We reject WMC's argument concerning the effect of WMC's status as debtor-in-possession on its fiduciary duties as managing partner. We find no indication that Congress intended the changes in a corporate debtor's status worked by the filing of a bankruptcy petition to absolve a partner of the duties of good faith and fair dealing owed to fellow partners during the winding up phase. We also reject WMC's arguments of claim and issue preclusion. We

further hold that, although a partner indisputably has a right to seek an in-court accounting for legitimate reasons, the trial judge's finding that WMC's suit was motivated by animus toward Holle and part of a concerted attempt to force Holle to abandon legitimate claims is supported by record evidence and that punitive damages accordingly were proper. Finally, we agree with Holle's contention on cross-appeal that the trial judge erroneously rejected the claim for unpaid rent. We therefore remand solely for a determination of damages on that issue.

## I. The Facts

### A. Transactional Background

The facts giving rise to this litigation follow a tortuous path, one the reader unhappily cannot be spared. In late 1969 a group of medical professionals and their friends and relatives formed a real estate investment partnership called Medical Center Associates (MCA), and acquired a parcel of land at 1143 New Hampshire Avenue for the purpose of constructing an apartment building. This project was abandoned shortly after construction began, and MCA hired Holle, an architect, to explore the feasibility of alternatively using the property as an extended care medical facility. After a favorable determination by Holle, MCA sought financing. Wachovia Bank and Trust Company agreed to finance construction and Metropolitan Life Insurance Co. to provide permanent financing. However, because MCA was a partnership and the agreed-upon interest rates exceeded the maximum rates for individual borrowers under District of Columbia law, the project could not go forward.

The interest rate limitations did not apply to corporate borrowers, however, and Washington Medical Center, Inc., a Virginia real estate investment corporation controlled by Dr. Oscar Hunter, one of the partners of MCA, agreed to obtain the loans and develop the medical facility. On September 2, 1969, a limited partnership called Metropolitan Hospital for Extended Care (MHEC) was formed consisting of WMC, the former partners of MCA (includ-

ing Dr. Hunter), Holle, and a number of others.[1]

Under the partnership agreement, WMC was the managing general partner, and at all times it maintained and controlled the partnership's books and records. Holle was denominated a general partner, but the agreement provided that he had no right to control or participate in the management of the partnership. Moreover, he contributed only $90,000 in architectural services, and the partnership agreed to hold him harmless for any liability exceeding the value of that contribution.

By 1975, when MHEC began receiving rent for the facility, Holle had a total ownership interest of 9.06% (1% as a general partner and 8.06% as a limited partner), and WMC had a total ownership interest of 83.44% (5% as a general partner and 78.44% as a limited partner). Eventually WMC acquired the ownership interests of all the other general partners, including Dr. Hunter, except for that of Holle. Pursuant to the partnership agreement, each of the general partners was liable for a certain percentage of MHEC's debts and liabilities. Although Dr. Hunter transferred his ownership interest to WMC, he remained liable for a share of the firm's liabilities. The final allocation of responsibility for firm debts and liabilities was: WMC, 81.541%; Dr. Hunter, 18.459%.

An additional agreement governing financing, construction and operation of the facility was also executed on September 2. It provided that WMC would hold legal title to the 1143 New Hampshire Avenue property as a "straw party" or agent for MHEC, the beneficial owner, until completion of the building, at which time WMC would convey title to MHEC. The partnership would then lease the building to Doctors' Hospital, Inc. (DHI),[2] and WMC would guarantee DHI's performance under the lease to the lenders. If WMC made a payment to any lender as guarantor, or otherwise incurred liability, it could seek reimbursement from MHEC and/or its general partners, except for Holle who was expressly excluded.

Pursuant to the agreement, MHEC authorized WMC to encumber and, in the event the extended care facility was uncompleted, to sell the 1143 New Hampshire Avenue property, subject to MHEC's right of first refusal. WMC obtained a construction loan from the Wachovia National Bank and Trust Company, N.A., and executed a promissory note secured by a deed of trust on the property; Metropolitan Life Insurance Company later purchased this note. On September 22, 1969, WMC obtained another loan from Wachovia that was later purchased by Weaver Brothers, Inc.; this note was also secured by a deed of trust on the New Hampshire Avenue property. WMC, as landlord and agent for MHEC, executed a lease of the property to DHI for a 20–year term.

The building was completed in 1971 and DHI operated it as an extended care medical facility until July 1972.[3] Because Medicare, Blue Cross and other insurers refused to reimburse patients for services provided at the facility, the venture was a failure and DHI incurred a $3.3 million loss in the first 1½ years of operation. To avoid further losses, in August 1972 DHI assigned its leasehold interest to WMC, the latter agreeing to assume DHI's lease obligations. These included the payment of rent to MHEC which amounted to an annual payment of $700,000.[4] Because WMC

---

1. Dr. Hunter was WMC's majority stockholder, owning 40% of the shares, with no other shareholder owning more than 5%. At the time MHEC was formed, he was President of WMC. In 1972, he was succeeded in this position by H. Charles Deyerberg.

2. DHI was a wholly-owned subsidiary of WMC. DHI operated Doctors' Hospital, a private hospital located on I Street, N.W. Dr. Hunter figured prominently in the affairs of DHI, having served at various times as a member of the Board of

Directors and an officer. Dr. Hunter also owned and operated the laboratory at Doctors' Hospital.

3. It appears that WMC never transferred legal title to MHEC after completion of the building as required by the agreement. In the bankruptcy proceeding, WMC represented that it held legal title to the property. The lease to DHI was made by WMC as landlord.

4. This sum resulted from a reduction to fair rental value in January 1973 under a revalua-

stood in the position of both landlord (as MHEC's agent and managing partner) and tenant (as DHI's assignee), these payments were but "paper" transactions in which WMC's books were debited and MHEC's credited each month. Significantly, WMC did not disclose the assignment and assumption of rental obligations to the other MHEC partners.

WMC operated the property at a loss as the Metropolitan Hotel from August 1972 to July 1975. In 1975 WMC subleased the entire building to a hotel management company, which operated a hotel on most of the premises until 1978. When losses continued to mount, WMC turned finally to a plan to convert the premises into an acute medical care facility.

This plan answered two critical needs of WMC: first, to turn the New Hampshire Avenue property to profitable use, and second, to find a new home for Doctors' Hospital (owned and operated by WMC's wholly-owned subsidiary, DHI), which was then being forced out of its I Street location. The plan called for WMC to buy out the minority partners of MHEC, and to sell the property to AHS Management Services, Inc. (AHS), a health care management company, for $8.195 million. AHS would then lease the premises back to Doctors' Hospital for twenty years. Although WMC, through its wholly-owned subsidiary DHI, would thus receive substantial profits from operating the acute care facility, WMC did not inform the other MHEC partners of these projections. To accomplish the conversion of the premises to the new Doctors' Hospital, WMC bought out some of the MHEC partners and obtained $2.25 million in loans from AHS secured in part by further encumbrances on the New Hampshire Avenue property. The existence of these encumbrances also was not disclosed to the remaining MHEC partners. Negotiations with AHS collapsed, and in September 1979

WMC, followed shortly by DHI, filed for bankruptcy and reorganization under federal bankruptcy laws.

The following additional facts relating to the New Hampshire Avenue property are relevant. From 1973 to 1977, WMC incurred losses of nearly $2.262 million in its efforts to convert the property. It carried these as its own losses on internal books and records and tax returns, although it also showed part of them as losses on MHEC's K–1 partnership tax returns. In 1976 WMC began charging MHEC interest on $1.8 million in alleged advances to MHEC during construction of the extended care facility. In 1977 WMC, for the first time, began charging MHEC a fee of 3% on the monthly rent for managing the New Hampshire Avenue property. Because no such fee had been charged from 1971–1977, WMC assessed a "retroactive" fee totalling $137,391.51.

### B. Bankruptcy Proceedings

On September 19, 1979, WMC filed for relief under the bankruptcy code in the United States Bankruptcy Court for the District of Columbia. WMC was permitted to continue operating as a debtor-in-possession by the bankruptcy court. *See* 11 U.S.C. § 1101(1) (1988). Under the MHEC partnership agreement, the filing of a bankruptcy petition dissolved the partnership. A major asset of WMC's estate in bankruptcy for purposes of chapter 11 was its interest in 1143 New Hampshire Avenue. Under a Plan of Arrangement filed on August 4, 1980, WMC, as debtor-in-possession, proposed to sell 1143 New Hampshire Avenue to the FCH Company and to use the proceeds as part of a fund from which creditors of the corporation would be paid. On May 19, 1980, WMC filed a Complaint to Sell Property Free and Clear of All Liens seeking approval of WMC's contract to sell the property to FCH.[5] The

---

tion of the property provided for in the partnership agreement.

**5.** WMC represented that it
 is the record owner of the Property and has an 83.4437% interest in the MHEC Partnership, both as limited and general partner.

WMC also owns certain personal property used in connection with the Property ... WMC has the necessary authority to sell, transfer and convey the Property, except that any such sale is subject to approval of this Bankruptcy Court.

bankruptcy court entered an order on June 18, 1980, ratifying the contract and authorizing the sale subject to determination of the amount each of the various named lienholders would receive from the proceeds. On September 17, 1980, WMC sent a letter to Holle advising him that his pro rata distributive share from the sale of 1143 New Hampshire Avenue would be $268,-000. WMC sold the property to FCH on November 26, 1980 for $10.1 million, and the proceeds were deposited in an escrow account subject to satisfaction of the liens.

After learning of WMC's petition in bankruptcy through a newspaper article, Holle retained counsel, who attended hearings in the proceeding from late March 1980 forward. At first Holle did not object to the sale of the property, asserting that WMC had agreed to an accounting to determine each partner's share, that the proceeds would remain in escrow pending final resolution, and that any shortfall would be made up with proceeds from the sale of another parcel of real property owned by WMC.

Although projections accompanying WMC's September 17, 1980 letter to Holle anticipated that distribution to the partners would be made on or about November 15, the partners received nothing at that time. After the sale, the $10.1 million was used to pay, first, debts of the partnership in favor of WMC, its principals and others, then the holders of the first trust deeds on the property, and then other creditors of WMC, leaving $3.45 million still in the escrow account. On December 16, 1980, this entire surplus was distributed to AHS (the health care management company) to satisfy the $2.25 million in loans from AHS to WMC which WMC, without disclosure to the MHEC partners, had secured with the partnership's New Hampshire Avenue property. This left nothing to distribute to the partners.[6]

The court confirmed the Plan of Arrangement on December 3, 1980, releasing WMC from "all dischargeable debts." Also on December 3, WMC wrote to all of the MHEC partners advising them that the property had been sold, and that WMC would be in a position to make distributions to the partners no later than March 15, 1981. On December 12, 1980, Holle filed with the bankruptcy court a Complaint for Injunction and to Determine Priority of Lien, and motions for a temporary restraining order and a preliminary injunction, alleging that the debts underlying the encumbrances in favor of AHS were WMC's and not debts of the partnership. Holle sought to enjoin distribution of any of the $3.45 million surplus to AHS pending the completion of an accounting to determine the respective shares of the MHEC partners in that surplus. On WMC's motion, the bankruptcy court dismissed Holle's complaint and motions as untimely because Holle had failed to raise an objection before confirmation of the plan. The court also held that it had no jurisdiction to entertain objections raised by Holle after confirmation.

Despite the fact that neither Holle, nor any of the partners, had received their distributive shares from the sale, on March 27, 1981, WMC sent Holle a K-1 partnership tax return for 1980 showing a $383,-

While the complaint listed a number of liens and encumbrances held by various entities, including Metropolitan Life, Weaver Brothers and AHS, it did not refer to the outstanding ownership interests of the other MHEC partners, including Holle. In addition, in its list of executory contracts accompanying the Plan of Arrangement, WMC did not list the lease assignment from DHI which obligated it to pay monthly rent to MHEC.

**6.** In her Memorandum Opinion and Order, Judge Kessler noted, as we do here, that this appears to have been a $1.2 million overpayment to AHS. AHS asserted status as a secured creditor of WMC based upon deeds of trust on both the New Hampshire Avenue property and another parcel owned by WMC located on Square 106. WMC disputed the amount of the liens. According to Holle's subsequently filed motion to set aside the Plan, on December 2, 1980, the bankruptcy court had determined the amount of AHS's claim against WMC's bankruptcy estate to be $3.1 million, plus attorney's fees and interest. A settlement was reached on December 11, 1980 whereby WMC agreed to direct the escrow agent to release the entire $3.45 million surplus to AHS. AHS's claim for interest and attorney's fees could account for the apparent overpayment.

000 capital gain from the sale of the property. On April 24, 1981, Holle filed a motion to set aside WMC's Plan of Arrangement, asserting that WMC had made fraudulent representations to the MHEC partners to obtain their acquiescence in the sale, and to the court to obtain confirmation of the plan.

At a May 22, 1981 hearing on Holle's pending motions, WMC advised the court that it had paid all the partners but Holle their distributive shares,[7] but that Holle would receive his check only if he executed a general release of all claims against WMC—a condition imposed on no other partner. On May 29, 1981, concluding that Holle had failed to carry his burden of proving that confirmation of the plan was procured by WMC's fraud, the bankruptcy court denied Holle's motion to set aside the plan, but ordered WMC to pay within ten days the $285,000 WMC admitted to be Holle's share, an order which WMC appealed. On July 10, 1981, the district court denied WMC's appeal and ordered WMC to pay Holle $270,000, the amount owing which WMC did not then dispute. WMC finally paid Holle $270,000 on July 11, 1981.

On April 29, 1983, United States District Judge Penn entered a Memorandum Opinion addressing three consolidated appeals arising from the WMC bankruptcy proceeding.[8] The bankruptcy court had erred, he concluded, in refusing to invoke its jurisdiction to interfere with the confirmed plan on the ground that Holle had failed to object prior to confirmation. Ultimately, however, Judge Penn agreed that the bankruptcy court had correctly ordered WMC to pay the undisputed amount to Holle.

### C. Superior Court Proceedings

After an accountant retained by Holle reviewed MHEC's books and records in April and May, on July 21, 1981, Holle's counsel wrote to WMC's counsel detailing a number of alleged breaches of fiduciary duty and contract by WMC, and threatening suit for substantial compensatory and punitive damages unless WMC responded favorably to an invitation to enter settlement negotiations. Not waiting for this action to materialize, on August 10, 1981, WMC filed a suit for an accounting and winding up of MHEC's affairs in Superior Court, naming only Holle as defendant. WMC alleged that the distributions of proceeds made to the partners had been erroneous, because WMC had treated all the losses incurred in operating the 1143 New Hampshire Avenue property—which should have been carried as MHEC's losses—as its own. It also alleged that the AHS deeds of trust should have been treated as partnership, not WMC, liabilities. These recently-discovered "errors", WMC asserted, substantially reduced the distributive shares payable to the partners, and accordingly Holle should have received nothing. Holle counterclaimed and independently filed suit against WMC and its president, Deyerberg, setting out allegations of breach of contract and fiduciary duty, and seeking compensatory damages in the amount of $400,-000. For WMC's pattern of bad faith in dealing with Holle and the other partners, Holle sought $6 million in punitive damages. WMC in turn counterclaimed, seeking $1 million in punitive damages against Holle.

The two actions were consolidated and on December 21, 1984, the Superior Court ordered that all the partners be made parties. After realignment and substitution of WMC as real party in interest for some of the partners, Holle and two other limited partners remained as plaintiffs, WMC and Deyerberg as defendants, and three additional partners as involuntary plaintiffs.

Following a lengthy bench trial, Judge Gladys Kessler issued a 56–page opinion in which she found that the defendants had

---

7. It appears that on May 13 the other partners had received an amount equivalent to their pro rata distributive shares from the sale of the New Hampshire Avenue property.

8. Before the court were Holle's appeal from the bankruptcy court's dismissal of his Complaint for Injunction and to Determine Priority of Lien; Holle's appeal from the bankruptcy court's denial of his motion to set aside the plan; and WMC's appeal from the bankruptcy court's order requiring it to pay Holle $285,000.

acted in bad faith and breached their fiduciary duties to Holle by: (1) failing to pay him his distributive share at the same time all the other MHEC partners were paid, and (2) filing suit against him alone and no one else. The court found that these actions were deliberate and calculated, along with other "malicious and oppressive" actions, to force Holle to abandon his inquiries and claims against WMC, justifying imposition of punitive damages in the amount of $750,000 on the claims of fiduciary breach particular to Holle.

The court further concluded that WMC had breached its fiduciary duties to the partners by: (1) having failed to convey title to MHEC of the New Hampshire Avenue property; (2) encumbering the New Hampshire Avenue property to secure loans by AHS to WMC that were the personal debts of WMC; (3) using the proceeds from the sale of the New Hampshire Avenue property to repay the loans to AHS without first providing the bankruptcy court with a plan of adequate protection for the partners' share of those proceeds; (4) failing to pay interest to the MHEC partners on the delayed distribution of their shares of the proceeds; (5) having charged MHEC management fees and interest on advances in violation of the agreements between the parties; and (6) having failed to adjust retroactively the MHEC partnership shares back to 1969 upon revaluation of the property in 1975, as required by the partnership agreement. The court awarded the former partners, including Holle, nominal and compensatory damages for these breaches based upon their pro rata partnership shares. The court also viewed these actions as "illustrat[ing] a clear and consistent pattern of bad faith in [WMC's] dealings with the MHEC partners."

The court denied Holle's claim for unpaid rent for the period after WMC filed its petition in bankruptcy (1979–80), concluding that it was bound by the prior ruling of another judge of the Superior Court, on a partial motion for summary judgment, that WMC had no duty to disclose to the other partners that it had taken the lease assignment from DHI. Judge Kessler also concluded that WMC's discharge in bankruptcy precluded further litigation of the rental obligation.[9]

## II. Legal Discussion

### A. Effect of Status as Debtor–in–Possession on Partnership Duties

WMC acknowledges the bedrock principle that partners owe each other the duty of "the utmost good faith in all that pertains to their relationship." *Riss & Co. v. Feldman*, 79 A.2d 566, 571 (D.C.1951). Contending, however, that the "fundamental issue" on this appeal "concerns the rights and fiduciary obligations of a corporate general partner in a dissolved limited partnership upon its adjudication as a bankrupt under Chapter XI of the Federal Bankruptcy Act," WMC maintains that Judge Kessler erred in failing to recognize that its fiduciary duties to the partnership were extinguished by the filing of the bankruptcy petition and the "new legal status" of debtor-in-possession conferred on it by the bankruptcy judge. Because, WMC reasons, the bankruptcy dissolved the partnership and its new status made it solely "a fiduciary of its estate owing fiduciary obligations to its creditors, under the supervision of the Bankruptcy Court," it could not be held liable under state law "for alleged post-petition breaches of its 'partnership fiduciary duties.'" Its actions, therefore, in repaying AHS without providing a plan of protection for the other partners' interests, withholding Holle's distributive share, and not paying him interest on his share, while redressable in bankruptcy court, could not be the subject of a suit in Superior Court.

Imaginative and studded with citations to federal bankruptcy law though this argument is, we conclude there is no authority for the counter-intuitive notion that Con-

---

9. The court also rejected WMC's statute of limitations defense to breach of agreement claims by Holle based upon WMC's charges for management fees and interest exceeding 8%, concluding that WMC had failed to carry its burden of proving Holle had received notice of the management fees and interest charges more than three years before the suit was filed.

gress intended a partner-debtor's resort to bankruptcy protection to nullify its fiduciary duties to other partners during the remaining life of the partnership, including the winding up and termination.[10] Moreover, we note at the outset the artificial nature of appellants' argument as applied to this case. Much of the conduct that Judge Kessler found to be a breach of fiduciary duties occurred *before* WMC filed its bankruptcy petition. Moreover, WMC's conduct which formed the primary basis for the critical punitive damages award—withholding Holle's share and suing him in Superior Court—occurred *after* WMC had emerged from the chapter 11 proceedings. It is thus difficult to perceive the relevance of WMC's "new entity" theory to the bulk of the judgment in Holle's favor. We nevertheless proceed to address the argument on the merits.

The term "debtor-in-possession" refers to a debtor in a chapter 11 case who is permitted to remain in possession of the bankruptcy estate and performs the functions and duties of a trustee in bankruptcy. 2 L. KING, COLLIER BANKRUPTCY MANUAL ¶ 1101.02 (1989). The legislative history of the Bankruptcy Reform Act of 1978 [11] explains:

> This section places a debtor in possession in the shoes of a trustee in every way. The debtor is given the rights and powers of a chapter 11 trustee. He is required to perform the functions and duties of a chapter 11 trustee (except the

investigative duties). He is also subject to any limitations on a chapter 11 trustee, and to such other limitations as the court prescribes.

S.REP. NO. 989, 95th Cong., 2d Sess. 116, *reprinted in* 1978 U.S.CODE CONG. & ADMIN. NEWS 5787, 5902. Although assumption of the duties of a trustee for the benefit of creditors during reorganization affords the debtor-in-possession certain relief, such as discharge of all debts after confirmation of a reorganization plan, 11 U.S.C. § 1141(d)(1)(A) (1988), and the right to reject executory contracts and unexpired leases, 11 U.S.C. § 365, no "new entity" is formed by filing for reorganization under Chapter 11. Indeed, the distinguishing features of reorganization in bankruptcy, as opposed to liquidation, are that the debtor entity is permitted to continue business during the pendency of the proceeding, under the supervision of the court, and that it survives the proceeding without the necessity of liquidation and consequent termination of the enterprise.[12]

Recognizing the fundamental purpose of reorganization, the United States Supreme Court recently rejected the contention that an employer's status as a debtor-in-possession made it a "new entity," not party to a pre-petition collective bargaining agreement, and thus not subject to restrictions imposed by § 8(d) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(d) (1982), for mid-term modifications of collec-

---

**10.** Appellee contends that WMC waived the debtor-in-possession argument by failing to raise it at trial until after the trial court had entered judgment on the issue of liability. We hold, however, that WMC did raise the issue, however inadequately, in a two-sentence paragraph of its thirty-page post-trial brief. It is clear, nonetheless, that the issue has assumed much greater importance for WMC now than it had at the trial level.

**11.** While WMC's bankruptcy proceeding was governed by the Bankruptcy Act of 1898, as it was filed two weeks before the effective date of the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, 92 Stat. 2549 (1978), the new statute adopted no new principles of bankruptcy law that affect our analysis in this section. Therefore, our citations are to the 1978 Act unless the result would be materially different under the old Act.

**12.** The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business' finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders ... During the progress of the case, the business of the debtor continues to operate. [I]f the debtor remains in possession, the debtor does what is necessary to reduce the business' losses, by selling unprofitable divisions, by closing certain plants or stores, by reducing the workforces, or by rejecting or renegotiating burdensome contracts. The debtor is relieved during the case from having to pay its prepetition debts. The additional cash flow thus freed is used to meet current operating expenses.
H.REP. NO. 595, 95th Cong., 2d Sess. 220–21, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 5963, 6179–80.

tive bargaining agreements. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) Justice Rehnquist, writing for the Court, concluded that the unilateral rejection of the contract by the debtor-in-possession prior to the bankruptcy court's approval did not constitute an unfair labor practice, deriving this conclusion from the strength of the policies reflected in the bankruptcy statute authorizing a debtor-in-possession to reject executory contracts.[13] Pertinent to our discussion, however, the Court expressly rejected the "new entity" rationale which the court of appeals had adopted:[14]

> Obviously, if the [debtor-in-possession] were a wholly "new entity," it would be unnecessary for the Bankruptcy Code to allow it to reject executory contracts, since it would not be bound by such contracts in the first place. For our purposes, it is sensible to view the debtor-in-possession as the same "entity" which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have employed absent the bankruptcy filing.

*Id.* at 528, 104 S.Ct. at 1197. While taking issue with the majority's balance of conflicting statutory policies, the dissenting Justices agreed that the "new entity" theory relied upon by the Third Circuit was untenable and properly rejected by the Court. *Id.* at 544, 104 S.Ct. at 1206 (Brennan, J., with whom White, Marshall and Blackmun, J.J., join, concurring in part and dissenting in part).[15]

■ In light of *Bildisco's* rejection of the "new entity" theory, it is apparent that WMC's appointment as debtor-in-possession did not fundamentally change its status so as to terminate its duties as managing general partner of MHEC. WMC continued to exist and operate as a corporate entity during the pendency of the chapter 11 proceeding, and its operations included management of MHEC.

Under the partnership agreement, the MHEC partnership dissolved upon WMC's filing of the petition in bankruptcy. Dissolution, however, is distinct from termination, and the partnership continued to exist until its business was wound up and a final accounting conducted. D.C.Code § 41–129 (1986); *see Warren v. Chapman*, 535 A.2d 856, 859 (D.C.1987). WMC's fiduciary duties as a partner continued throughout these latter two phases. *See, e.g.*, D.C.Code § 41–120(a) (partner accountable as fiduciary for any benefit derived in any transaction connected with formation, conduct *or liquidation* of partnership); 2 A. BROMBERG & L. RIBSTEIN, BROMBERG AND RIBSTEIN ON PARTNERSHIP, § 7.08, at 7:87 (1988).[16] WMC erroneously suggests that

---

**13.** The majority's holding in *Bildisco* prompted Congress to adopt a new section of the Bankruptcy Code prohibiting an employer/debtor-in-possession's rejection of a pre-petition collective bargaining agreement without an expedited hearing and court approval. Bankruptcy Amendments and Federal Judgeships Act of 1984, Pub.L. No. 98–353, tit. II, subtit. J, § 541(a), 98 Stat. 390 (codified at 11 U.S.C. § 1113 (Supp. III 1985)).

**14.** *See In re Bildisco*, 682 F.2d 72, 82 (3d Cir. 1982). The circuit court in *Bildisco* derived the "new entity" rationale from *Shopmen's Local Union No. 455 v. Kevin Steel Prod.*, 519 F.2d 698, 704 (2d Cir.1975).

**15.** In its brief, WMC relies upon the *Shopmen's* decision, *supra* note 14, and other similar holdings as support for its "new entity" argument. In adopting legislation that effectively overruled the *Bildisco* holding regarding unilateral rejection of collective bargaining agreements, see *supra*, note 13, Congress responded to the dis-

sent's critique concerning the majority's lack of deference to the strong policy in favor of promoting industrial peace reflected in the NLRA. Although Congress struck a balance between this policy and those reflected in the Bankruptcy Act in a manner different than the majority, it did not appear to reach the Court's repudiation of the "new entity" rationale. Because rejection of that theory had the unanimous support of the Court, and is consistent with 11 U.S.C. § 1113, we conclude that it was unaffected by the congressional reaction to *Bildisco*. The *Shopmen's* decision and other authorities WMC cites in support of the "new entity" theory are thus of dubious precedential value.

**16.** WMC's claim that it no longer acted as managing partner of WMC after filing the petition in bankruptcy is, of course, inconsistent with the action for an accounting which it later filed, and which could not have been maintained unless WMC were a partner. The filing of that action implicitly recognized that the affairs of

its duties to the partnership somehow conflicted with its duties as trustee for the benefit of its creditors, and that the interests of the partners must therefore yield to those of the creditors. To the contrary, as will be seen, WMC's duties as bankruptcy trustee not only permitted but *required* it to protect the interests of the MHEC partners.

■ A debtor-in-possession, in discharging its duties as a trustee, acts in a fiduciary capacity for the benefit of those with claims against the bankruptcy estate. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355, 105 S.Ct. 1986, 1994, 85 L.Ed.2d 372 (1985); *Wolf v. Weinstein*, 372 U.S. 633, 649–51, 83 S.Ct. 969, 979–80, 10 L.Ed.2d 33 (1963); *In re Woodson*, 839 F.2d 610, 614 (9th Cir.1988); *In re Technical Knockout Graphics*, 833 F.2d 797, 802–03 (9th Cir.1987). The scope of these duties, however, is defined by the property interests comprising the estate. *In re Technical Knockout, supra*, 833 F.2d at 802. The bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Here, the post-petition breaches of WMC's fiduciary duty to the partnership which Judge Kessler found arose from the manner in which WMC had handled the New Hampshire Avenue property. Judge Penn, in ruling on Holle's appeal from the denial of his motion to set aside WMC's Plan of Arrangement, concluded that the interests of the MHEC partners in the New Hampshire Avenue property were *not* part of the bankruptcy estate. He noted that WMC possessed only bare record title in the New Hampshire Avenue property, of which MHEC was the beneficial owner. He found that because WMC held the property in trust for the partnership, it had a duty to propose a means of adequately protecting the partners' interests in bankruptcy, *see* 11 U.S.C. §§ 361, 363(c), which it had failed to discharge. WMC argues that its failure to recognize the MHEC partners' interests in the sale of the property constituted only a breach of its duty under federal bankrupt-

cy law to provide adequate protection, redressable in bankruptcy court, but not a breach of duty under District of Columbia partnership law. We disagree.

Judge Penn's recognition of WMC's continuing trust duties to the partnership reflected the principle, now codified in 11 U.S.C. § 541(d), that

> only the debtor's interest in ... property becomes part of the estate. If the debtor holds bare legal title or holds property in trust for another, only those rights which the debtor would have otherwise had emanating from such interest pass to the estate.

> \* \* \* \* \* \*

> To the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate ...

124 CONG. REC. H11096, 11114 (Sept. 28, 1978). *See also In re Auto–Train Corp.*, 258 U.S.App.D.C. 151, 154, 810 F.2d 270, 273 (1987). As this rule implies, a bankrupt fiduciary's status as debtor-in-possession does not necessarily extinguish its previous duty to handle property in its control in a manner consistent with fiduciary obligations. In circumstances where the debtor holds property in trust for another, as in this case, the trustee (or debtor-in-possession) must discharge the debtor's trust duty to turn over the property to the beneficial owner. *See, e.g.*, 124 CONG. REC. S17413 (Oct. 6, 1978) (trustee of bankrupt mortgage seller with bare legal title to mortgages for servicing purposes must deliver mortgages to purchaser); *In re B.I. Fin. Servs.*, 854 F.2d 351, 354 (9th Cir.1988) ("courts generally hold that the debtor should turn the property over to the beneficial owner"). Further indicating that Congress did not intend resort to bankruptcy protection to extinguish preexisting fiduciary duties, the Code provides that a discharge in bankruptcy does not absolve a debtor from any debt for "fraud or defalcation while acting in a fiduciary capacity...." 11 U.S.C. § 523(a)(4).

Any duty WMC had toward its creditors as debtor-in-possession related solely to its

---

the MHEC partnership were not entirely wound up in the bankruptcy proceeding.

own property held in the bankruptcy estate. This property included its own partnership interest, but did not extend to the interests of the other MHEC partners in the New Hampshire Avenue property. *See* H. REP. NO. 595, *supra*, at 199, 1978 U.S. CODE CONG. & ADMIN.NEWS at 6159 ("When a partner is a debtor in a case under title 11, *the partner's interest in the partnership ... is property of the partner's estate*"). The extent and nature of the debtor's interest in specific property is a question determined by reference to state law, not federal bankruptcy law. *In re B.I. Fin. Servs., supra*, 854 F.2d at 354; *In re Auto–Train, supra*, 258 U.S.App.D.C. at 154, 810 F.2d at 273. Because the realty at New Hampshire Avenue was partnership property, under the District of Columbia Partnership Act, WMC held the proceeds of its sale in trust for the benefit of MHEC. D.C.Code § 41–120(a). Consequently, WMC's use of the proceeds of the sale to satisfy its own creditors without adequately protecting the interests of the MHEC partners, in addition to constituting a breach of the statutory duty of adequate protection (as Judge Penn found), was conduct Judge Kessler could properly find to be self-dealing and a breach of the duty of loyalty imposed by District of Columbia partnership law.

We conclude, therefore, that WMC's status as debtor-in-possession did not relieve it of the duty of good faith which it owed MHEC and Holle until winding up and termination of the partnership.[17]

## B. Claim and Issue Preclusion

 In a second argument derived from its recourse to bankruptcy protection, WMC invokes principles of *res judicata* and collateral estoppel to assert that Holle's litigation in Superior Court of claims of fiduciary breach was barred because these issues had been "tried and finally resolved in the bankruptcy proceeding." WMC refers specifically to Judge Kessler's findings in regard to (1) WMC's encumbrance of partnership property with deeds of trust in favor of AHS Management Services, (2) WMC's disbursement of the proceeds of the sale of the property to AHS without protecting the interests of the other partners, and (3) WMC's failure to pay the partners interest on the proceeds of the sale. The bankruptcy court, however, specifically reserved these issues for resolution in another forum, and for that reason appellants' contention lacks merit.

### 1. Claim Preclusion

Under the doctrine of claim preclusion or *res judicata*, when a valid final judgment has been entered on the merits, the parties

---

17. WMC's reliance on *In re Harms*, 10 B.R. 817 (Bankr.D.Colo.1981), is misplaced. First, that decision is based upon the "new entity" rationale of the Second Circuit repudiated in *Bildisco. See* 10 B.R. at 821, *citing In re Unishops*, 543 F.2d 1017 (2d Cir.1976); *Allegaert v. Perot*, 548 F.2d 432 (2d Cir.), *cert. denied*, 432 U.S. 910, 97 S.Ct. 2959, 53 L.Ed.2d 1084 (1977). Moreover, *Harms* did not address the situation presented here. The court held that seven limited partnerships had been dissolved by the general partner's assumption of debtor-in-possession status, and that the general partner could not elect to assume the partnership agreements as executory contracts under 11 U.S.C. § 365. The court perceived an inherent conflict of interest between the debtor-in-possession's existing fiduciary duties to the partnerships, and its acquired status as debtor-in-possession, which precluded it from assuming the contracts and continuing to operate the partnerships as general partner. The court explained:

> In the case before the court, the limited partners have not consented to the performance of the debtor-in-possession as their general partner. Therefore, the limited partnerships, having no general partner as of the day the debtor came into possession, ceased to exist (*except for purposes of winding up which follows dissolution* ).

*Id.* at 822 (emphasis added). While the court refused to allow the bankrupt partner to carry on the business of the limited partnerships, it was not confronted with, and did not reach, questions concerning the effect of conduct amounting to breaches of partnership duties during the winding up phase, although it recognized that the partnership technically continued to exist during that period. The court's "conflict-of-interest" reasoning was soundly applied to prevent divided loyalties that could occur if the general partner continued to operate the limited partnerships during bankruptcy. WMC takes the rationale beyond its proper context in invoking it to excuse a general partner's self-dealing after dissolution but before a final settlement of accounts.

or those in privity with them are barred, in a subsequent proceeding, from relitigating the same claim or any claim that might have been raised in the first proceeding. *Smith v. Jenkins*, 562 A.2d 610, 613 (D.C. 1989); *Stutsman v. Kaiser Found. Health Plan*, 546 A.2d 367, 369–70 (D.C.1988). The judgment embodies an adjudication of all the parties' rights arising out of the transaction involved. *Stutsman, supra*, 546 A.2d at 370. Therefore, the prior adjudication "bars" claims actually raised, and those which the plaintiff failed to raise are said to "merge" into the prior judgment. *Smith, supra*, 562 A.2d at 613. The doctrine operates to preclude assertion of "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Id., quoting* RESTATEMENT (SECOND) OF JUDGMENTS § 24(1) (1982). It does not matter that the earlier and later proceedings differ in nature: "as long as the parties are the same, and the essence of the claim and evidence necessary to establish it are the same, *res judicata* applies." *Williams v. Gerstenfeld*, 514 A.2d 1172, 1179 (D.C.1986) (citation omitted). Thus, orders entered in bankruptcy proceedings constituting a final adjudication may bar subsequent proceedings in Superior Court. *Id.*

Ordinarily, then, an order of the bankruptcy court disposing of *any* of Holle's claims arising out of the sale of the New Hampshire Avenue property or the distribution of the proceeds would bar litigation of *all* such claims. The doctrine of claim preclusion expresses a rule of judicial administration prohibiting the "splitting" of causes of action.[18] A well-recognized exception to this rule exists, however, in cases where the "court in the first action has expressly reserved the plaintiff's right to maintain the second action[.]" RESTATEMENT (SECOND) OF JUDGMENTS, *supra*, § 26(1)(b). We conclude that this exception applies here.

Holle first pursued his rights in bankruptcy court by filing a Complaint for Injunction and to Determine Priority of Lien, and motions for a temporary restraining order and preliminary injunction, seeking to subordinate the "non-partnership" liens in favor of AHS Management Services to the beneficial interests of the MHEC partners, and to enjoin distribution to AHS of any of the $3.45 million surplus remaining from the sale of the property. In support of this complaint, he asserted that although WMC held legal title, MHEC was the beneficial owner of the property, and that the debts underlying the encumbrances in favor of AHS were WMC's and not debts of the partnership. After the bankruptcy court dismissed the complaint for want of jurisdiction,[19] Holle filed a motion to Set Aside or Modify the Plan of Arrangement and for Other Relief, asserting that WMC had procured the partners' consent to the sale of the property by fraudulently representing (a) that only WMC's interest in the New Hampshire Avenue property would be used to satisfy WMC creditors pursuant to the Plan of Arrangement, and (b) that substantial equity remained in the property out of which the MHEC partners would receive their distributive shares. Actually, Holle claimed, WMC intended to use the proceeds, including the other partners' shares, to satisfy *non-partnership* creditors including AHS, and failed to disclose the encumbrances in AHS's favor or that

---

18. "[A] party having several alternative grounds for relief arising out of a particular transaction does not have the privilege of litigating his theories one at a time, holding one in reserve while he presses another to judgment." *Stutsman, supra*, 546 A.2d at 371 n. 7, *quoting Brotherhood of R.R. Trainmen v. Atlantic Coast R.R.*, 127 U.S.App.D.C. 298, 300, 383 F.2d 225, 227 (1967), *cert. denied*, 389 U.S. 1047, 88 S.Ct. 790, 19 L.Ed.2d 839 (1968).

19. United States Bankruptcy Court Judge Whelan, noting that Holle had filed the complaint after the court's confirmation of WMC's Plan of Arrangement, concluded that "after confirmation, the Court does not have jurisdiction to embroil itself in the general business affairs of the debtor," and so granted WMC's motion to dismiss Holle's complaint. On appeal to the district court, Judge Penn concluded that Judge Whelan erred in dismissing the complaint for want of jurisdiction. *See* pages 1282–1283 *infra*.

these debts had reduced the equity almost to zero.

The bankruptcy court denied the motion, finding that, although Holle was a party in interest, he had failed to prove by clear and convincing evidence that WMC had procured confirmation of the plan by fraudulent concealment of the AHS deeds of trust.[20] But although the court found insufficient proof of fraud, it explicitly limited its holding to that issue:

> These findings are expressly limited to the narrow issue before the court, which is the claim of fraud in the procurement of the Plan of Arrangement, and is [*sic*] in no way intended to limit or prejudice any rights which Holle may have, legal or equitable, which he may seek to assert in any other forum.

While the court declined to set aside the plan, it exercised its equitable powers and ordered WMC to pay Holle $285,000, the amount which WMC at that point conceded was Holle's distributive share of the proceeds. Reiterating that it was reserving Holle's claims to an amount in excess of that sum for another day in another forum, the court wrote:

> Nothing in this Order shall be construed as a finding that Holle's [distributive partnership] share is limited to $285,000 or as limiting Holle's right or opportunity in any appropriate forum to prove a greater amount.

There could be no clearer expression of the bankruptcy court's intention not to preclude litigation of Holle's other claims in another forum. As the relevant comment in the Restatement notes:

> A determination by the court that its judgment is "without prejudice" (or words to that effect) to a second action on the omitted part of the claim, expressed in the judgment itself, or in the

findings of fact, conclusions of law, opinion, or similar record, unless reversed or set aside, should ordinarily be given effect in the second action.

RESTATEMENT (SECOND) OF JUDGMENTS, *supra*, comment to § 26(1)(b). Nor are we persuaded by WMC's contention that the district court's opinion and order affirming Judge Whelan's orders somehow resolved issues left open for resolution in another forum.

Judge Penn concluded that because the MHEC partners' beneficial interest in the property was not even part of the bankruptcy estate, the bankruptcy court had no power over it as part of the Plan of Arrangement. He held that Holle could not be faulted for failing to assert his interest prior to confirmation of the Plan, because the Bankruptcy Act imposed a duty on WMC to propose a means of adequately protecting the interest of co-owners such as Holle before it distributed the property—a duty which WMC had breached. Once the transfer of the proceeds had begun, the court reasoned, and Holle sought relief from the bankruptcy court, the bankruptcy court had jurisdiction to prohibit the transfer to AHS until WMC discharged its duty to protect Holle's interests adequately.

While Judge Penn disagreed with Judge Whelan's conclusions concerning the bankruptcy court's jurisdiction to consider Holle's claims, he found the bankruptcy court's order requiring WMC to pay Holle the undisputed amount a "proper exercise of its jurisdiction" and "agree[d] with the ultimate result reached." Judge Penn issued an order affirming "the result" reached by the bankruptcy court, and ordering that the remaining $230,000 in proceeds from the sale then in escrow [21] con-

---

20. Judge Whelan found that the existence of the AHS liens was a matter of public record, WMC had disclosed them in its Complaint to Sell the Property Free and Clear of Liens in May 1980, Holle had retained counsel to represent him in the bankruptcy proceeding in March of that year, and that counsel's knowledge was imputed to Holle.

21. Along with his motion to set aside the plan, Holle filed a motion to stay distribution of the remaining proceeds of the sale pending a final decision. When the bankruptcy court denied these motions, Holle appealed to the district court and moved for approval of a bond and a stay of distribution pending appeal, which the court granted to the extent of $500,000. The stay was based on Holle's assertion that he might be entitled to more than the $270,000

tinue to remain on deposit for 30 days "so the parties will have an opportunity to raise the issue of stay with the Superior Court."

From this opinion and order, WMC extrapolates that: (1) Judge Penn recognized that the bankruptcy court had jurisdiction to afford complete relief among the parties; (2) he concluded that WMC had breached its statutory duty to afford Holle adequate protection; (3) the $270,000 the court had previously ordered WMC to pay Holle "resolved the matter" of this breach of duty; and (4) because $270,000 was less than the $285,000 WMC conceded before the bankruptcy court that it owed Holle (a sum apparently including $15,000 in interest), Judge Penn effectively determined that Holle was not entitled to receive interest on his distributive share. WMC ignores several key details of Judge Penn's order, as well as its affirmance of and agreement with Judge Whelan's disposition.

In the opinion, Judge Penn noted that the bankruptcy court had denied Holle's stay request because "WMC would emerge from the Chapter XI proceeding a solvent corporation, ... Holle's rights could be protected by [an] action in the appropriate court," and that the issue of the amount properly due Holle from the sale of the property was then before the Superior Court in the suit for an accounting. Judge Penn's agreement with Judge Whelan's reservation of issues concerning whether Holle was entitled to an amount beyond what the district court had already ordered WMC to pay is reflected in the court's order refusing to distribute the sale pro-

ceeds still in escrow to give the parties (presumably Holle) an opportunity to seek a "stay" in Superior Court. Procedurally, this affirmance left the case in exactly the same posture as the bankruptcy court's disposition. There is thus no support for WMC's assertion that the district court undertook, without saying so, to reach the merits of issues the bankruptcy judge expressly had reserved for another forum.[22]

## 2. Issue Preclusion

■ Issue preclusion, in contrast to claim preclusion, renders conclusive in the same or a subsequent action determination of an issue of fact or law when (1) the issue is actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privies; (4) under circumstances where the determination was essential to the judgment, and not merely dictum. *Smith v. Jenkins, supra,* 562 A.2d at 617; *Ali Baba Co. v. WILCO, Inc.,* 482 A.2d 418, 421 (D.C.1984). According to Judge Whelan's order, the only issue of law actually litigated and determined in the bankruptcy proceeding was whether the Plan of Arrangement had been procured by fraud. As to issues of fact, the court found that Holle was on constructive notice of the encumbrances on the New Hampshire Avenue property in favor of AHS. The court did not reach issues—ultimately resolved in the Superior Court— concerning whether those encumbrances, WMC's use of proceeds from the sale of partnership property to satisfy its own creditors, or its failure to protect the partners' interests prior to selling the property

WMC identified as his distributive share. The $500,000 was placed on deposit in escrow. Although it denied Holle's motions, as discussed previously, the bankruptcy court ordered WMC to pay Holle $285,000, and also ordered that the remaining $215,000 remain in escrow pending the outcome of Holle's and WMC's appeals. After the district court denied WMC's motion to stay the bankruptcy court's order and required WMC to pay Holle the undisputed sum of $270,-000, $230,000 remained on deposit.

22. Equally meritless is WMC's point that the district court's reduction of the "undisputed" amount somehow resolved Holle's claim to entitlement of interest on his distributive share.

In ordering WMC to pay Holle $270,000, Judge Penn merely affirmed and implemented the order of the bankruptcy court that WMC pay Holle the sum *which it conceded it owed,* leaving Holle's other claims to an amount exceeding that sum, including the claim to interest, to be resolved elsewhere. WMC's position (for purposes of appeal to the district court) that it owed less than it had admitted before Judge Whelan does not signify that the district court reached the merits of the issue concerning interest. Therefore, the rulings of the bankruptcy court and the district court do not stand as a bar to the assertion of Holle's claims in Superior Court.

constituted breaches of fiduciary duties to the MHEC partners, or whether Holle was entitled to an amount in excess of the sum undisputed by WMC. Because the whole range of factual and legal issues associated with these claims, and other pre-petition claims of fiduciary breach, was neither actually litigated nor determined on the merits in the bankruptcy proceeding, we also reject WMC's estoppel argument.[23]

### C. Punitive Damages

In a case tried without a jury, whether an award of punitive damages is warranted is a matter committed to the discretion of the trial court. *Harris v. Wagshal*, 343 A.2d 283, 288 n. 13 (D.C. 1975); *United Sec. Corp. v. Franklin*, 180 A.2d 505, 511 (D.C.1962); *Riss & Co. v. Feldman, supra*, 79 A.2d at 571. *See also Mariner Water Renaturalizer v. Aqua Purification Sys.*, 214 U.S.App.D.C. 248, 253, 665 F.2d 1066, 1071 (1981). Therefore, the abuse of discretion standard guides our review. *See Johnson v. United States*, 398 A.2d 354, 361–65 (D.C.1979). Under this standard, we undertake a two-pronged inquiry, determining (1) whether the court "has exercised its discretion within the range of permissible alternatives, based on all relevant factors and no improper factor," and (2) whether the decision is supported by substantial reasoning, drawn from a firm foundation in the record. *In re R.M.G.*, 454 A.2d 776, 790 (D.C.1982).

In this context, the legal requirements for imposition of punitive damages define the relevant factors the judge must consider in deciding whether to award them. Punitive damages are warranted only when the defendant commits a tor-

---

**23.** We find no merit in WMC's arguments concerning the trial court's disposition of Holle's claims (and WMC's defenses) relating to WMC's assessment of "management fees" and excessive interest on certain advances in violation of the partnership agreement. Judge Kessler applied correct legal principles and her factual findings are supported by substantial record evidence, and thus we reject WMC's arguments on these matters without further discussion.

**24.** Ordinarily, where the basis of the claim is a breach of contract, punitive damages will not

---

tious act "accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury," *Parker v. Stein*, 557 A.2d 1319, 1322 (D.C.1989), *quoting Franklin Inv. Co. v. Homburg*, 252 A.2d 95, 98 (D.C. 1969). *See also Robinson v. Sarisky*, 535 A.2d 901, 906 (D.C.1988). Whether punitive damages will lie depends on the intent with which the wrong was done, and not on the extent of the actual damages. *Id.* at 907 (citations and quotation marks omitted). Because direct proof will rarely be available, the finder of fact may infer the requisite mental state from all facts and circumstances surrounding the case. *Parker, supra*, 557 A.2d at 1322; *Robinson, supra*, 535 A.2d at 906.

### 1. Suit for Accounting as Breach of Fiduciary Duty

Given that some form of tortious conduct must undergird an award of punitive damages,[24] WMC argues that by asserting its legal right to an in-court accounting it breached no duty toward Holle. Judge Kessler found, to the contrary, that the action for an accounting was unfounded and asserted maliciously by WMC to attain improper objectives. We will reverse this fact-specific determination only if it is plainly wrong or without evidence to support it. D.C.Code § 17–305(a) (1989); *see Simpson v. Chesapeake & Potomac Tel. Co.*, 522 A.2d 880, 885 (D.C.1987) (implied finding, as predicate for Rule 11 sanctions, that pleading was filed in bad faith "was not clearly erroneous"). Judge Kessler's finding is supported by the record.

---

lie. *Sere v. Group Hospitalization*, 443 A.2d 33, 37 (D.C.), *cert. denied*, 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982). Despite the contractual source of partners' duties *inter se*, however, it is well established that when a fiduciary duty exists between the parties, and the conduct complained of constitutes a breach of that duty, the claim sounds in tort "regardless of contractual underpinnings." *Wagman v. Lee*, 457 A.2d 401, 404 (D.C.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 158, 78 L.Ed.2d 145 (1983).

■ A partner's right to an in-court accounting is an essential incident of the partnership relation. *See* D.C.Code § 41–121 (1986). It is the means by which a partner can enforce the duty of his co-partners to hold as trustee for the partnership any benefit derived from transactions connected with the formation, conduct or liquidation of the partnership without destroying the enterprise. *See* D.C.Code § 41–120(a); *id.* § 41–121(3).[25] An accounting is also the penultimate event in the lifetime of the partnership. It follows dissolution and the winding up of partnership affairs, and marks the point at which the partners' fiduciary duties *inter se* and the legal existence of the partnership terminate. *See* D.C.Code § 41–129 ("[o]n dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed"); *Warren v. Chapman, supra,* 535 A.2d at 859. *See also Cowan v. District of Columbia Dep't of Finance and Revenue,* 454 A.2d 814, 815 (D.C.1983) (per curiam) (realty does not lose its character as partnership property until final distribution between partners). As we recently held: "A partner has a right to an accounting upon dissolution, and indeed has a right to obtain the assistance of the court if such an accounting is refused." *Warren v. Chapman, supra,* 535 A.2d at 860.

Because the right to an account is a central incident of partnership status, its assertion cannot in itself, under ordinary circumstances, form the basis for a claim of fiduciary breach. *See Weil v. Diversified Properties,* 319 F.Supp. 778, 784 (D.D. C.1970) (counterclaim by limited partners for breach of trust based on general partner's suit for accounting dismissed; "[t]here is no rule of law that denies the courts to a partner who mistakenly ques-

tions the conduct of his partners"). But while a partner's right to seek legitimate redress in the courts is unquestioned, it is equally basic that use of a lawsuit as a private means to oppress another or coerce him to do what he legally cannot be compelled to do is an abuse of that right. *See, e.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622–23, 44 L.Ed.2d 141 (1975) (under exception to the American Rule, prevailing party may recover attorney fees and litigation costs upon proof that opponent has maintained unfounded suit "in bad faith, vexatiously, wantonly, or for oppressive reasons"). Besides the institutional harm that malicious and unfounded litigation begets, the law recognizes that the person targeted suffers injury, and accordingly affords a cause of action in tort for abuse of judicial process. As we explained in *Williams v. City Stores,* 192 A.2d 534 (D.C.1963):

> To charge an abuse of process, there must be a perversion of court processes to accomplish some end which the process was not intended by law to achieve, or which compels the party against whom it has been used to do some collateral thing which he could not legally and regularly be compelled to do.

*Id.* at 537. *See also Jacobson v. Thrifty Paper Boxes,* 230 A.2d 710, 711 (D.C.1967).

■ As explained earlier, partners owe each other the duty of "the utmost good faith in all that pertains to their relationship." *Riss & Co. v. Feldman, supra,* 79 A.2d at 571. This duty persists until the partnership affairs have been wound up and the relation is terminated, even after relations have become strained. 2 A. BROMBERG & L. RIBSTEIN, *supra,* § 6.07, at 6:72–73.[26] Self-evidently, the pursuit of mali-

---

**25.** Prior to the Uniform Partnership Act's recognition of a partner's right to demand a formal accounting when a co-partner breached his fiduciary duty to account, it was necessary to formally dissolve the partnership, with the resulting consequence of liquidation and destruction of the business. *See* Commissioner's note to UNIFORM PARTNERSHIP ACT § 22, 6 U.L.A. 284 (1969) ("ordinarily, a partner is not entitled to a formal account, except on dissolution"). "To relieve the dilemma of the partner who seeks a

pre-dissolution account, the drafters of the U.P.A. broadened the grounds for an accounting so that it is not contingent on dissolution." 2 A. BROMBERG & L. RIBSTEIN, *supra,* § 6.08, at 6:97.

**26.** As these authors stated:

> Even if the partners are no longer working together or getting along, the conditions that initially gave rise to the partners' fiduciary duties—the entrustment to the partners of

cious and ill-founded litigation by one partner calculated to coerce another to abandon his legal rights, or to punish him for asserting them, violates the extraordinary duty of good faith and fair dealing that partners owe one another in partnership affairs.

Judge Kessler found WMC's suit for an accounting to be groundless on the merits because WMC failed to demonstrate that the losses for which it sought reimbursement from MHEC had been incurred on behalf of the partnership. She based this finding upon the following evidence: Deyerberg, the president of WMC, testified that the period during which WMC claimed MHEC incurred losses was the time when Doctors' Hospital, Inc. (WMC's wholly-owned subsidiary) was operating the New Hampshire Avenue property as an extended care facility; all of WMC's witnesses, including Deyerberg and Hunter, admitted that DHI had been responsible for these losses while it was operating the facility; [27] and WMC's consolidated tax returns showed that it, not MHEC, had enjoyed the tax advantages of these losses (totalling $3.3 million), as well as an additional $2.261 million in operating losses for the years 1973–77. The court also found that WMC's sudden realization of its "mistake" in treatment of losses, and its claim for $1 million in punitive damages against Holle, were not fortuitous but rather part of a "strategic ploy calculated to punish and retaliate against Holle for questioning the management of MHEC by WMC, and—because of the dismayingly high costs of litigation as well as the risk of liability on the ...

punitive damages claim—to coerce and intimidate him into abandoning his claims."

As evidence of the "true purpose" of the lawsuit, the trial court emphasized that Holle was singled out among all the partners as the named defendant. She rejected WMC's explanation that Holle was sued because he was the only general partner left, noting that Dr. Hunter was still a general partner and that, pursuant to the partnership agreement making Hunter responsible for 18% of the partnership liabilities, under WMC's theory, he would be liable for $1.26 million of the $7 million WMC alleged it was entitled to recover. WMC failed to explain why it sued "the one person who had persistently raised questions about its management of the partnership instead of the other person from whom a greater recovery could be won." The court also found unpersuasive WMC's contention that, because the action was for an accounting and all partners would have to be joined eventually, it made no difference who was sued, noting that the named defendant bears costs of litigation and the greatest risk of losing his distributive share.

WMC argues that the trial court ignored significant evidence providing a legitimate explanation for WMC's failure to name Dr. Hunter—namely, that Hunter had previously transferred his rights to receive a distributive share. This fact, however, does not undermine the court's reliance on the partnership agreement provision under which Hunter remained liable for 18% of the partnership liabilities, regardless of his entitlement to share in the surplus.[28] More importantly, even if we found WMC's ex-

---

substantial control over the interests of their co-partners—still exist in these situations. 2 A. Bromberg & L. Ribstein, *supra,* § 6.07, at 6:73. These conditions are even more pronounced in the case of managing general partners in a limited partnership, on whose good faith the other partners depend entirely. *Id.* at 6:71 & n. 9.

**27.** Judge Kessler noted that Deyerberg testified to this effect in deposition, but revised his testimony at trial where he asserted that DHI was entitled to any and all profits earned, but that MHEC was responsible for the losses. She found Deyerberg's trial testimony incredible, and noted that no documentary evidence corroborated his rather far-fetched interpretation.

**28.** In its reply brief, WMC offers yet another explanation for failing to join Hunter or the other partners. It asserts that "[t]he amount for which WMC sought reimbursement for its effort following the collapse of the extended care concept has at all times been $3,757,128.00," representing losses for the period 1973 to 1980. WMC notes that if the trial court in the accounting had upheld the indemnification provisions of the partnership agreements entitling WMC to recoup expenditures made on behalf of the partnership, the $5.1 million in distributable proceeds from the sale of the property "would have been more than sufficient to provide for reimbursement of WMC's losses without the need to look to Hunter or any other partner personally."

planations credible, our standard of review constrains us from substituting our view for that of the trial judge, who had the opportunity to observe the demeanor of the witnesses and the tenor of their testimony. *See Johnson, supra,* 398 A.2d at 362, *citing Noonan v. Cunard Steamship Co.,* 375 F.2d 69, 71 (2d Cir.1967). The court found as a fact that omitting the other partners from the suit evinced WMC's improper motive and *male fides* toward Holle when considered against the backdrop of a pattern of conduct explicable, in the aggregate, only as an attempt to force Holle to abandon his claims. We uphold, as supported by sound reasoning and a firm foundation in the record, the trial judge's findings that the suit was brought in bad faith and to achieve an improper goal, acts which constituted a breach of WMC's duty to deal with Holle in good faith.

Our holding is a limited one. As Judge Gesell pointed out in *Weil v. Diversified*

*Properties, supra,* the law does not deny "the courts to a partner who mistakenly questions the conduct of his partners." 319 F.Supp. at 784. Partnership disputes like any others may be marked by bad feelings and hostility, and our holding does not affect the vast majority of instances where one partner legitimately—and aggressively—questions the conduct of another in an action for an accounting, only to be proven mistaken at some stage of the proceedings.[29] We deal here with a finding by the trial court that WMC brought suit for reasons antithetical to the purpose of an accounting or any other legal action, and it is that finding that we sustain.

### 2. Aggravation of the Injury

■ We must still determine whether the trial court properly found that WMC's tortious conduct aggravated Holle's injury sufficiently to warrant imposition of puni-

---

We are unpersuaded. First, as indicated on a schedule WMC sent the partners after the sale of the property, the amount available for distribution to the MHEC partners, after the holders of the first trust deeds and other WMC creditors were paid, was approximately $2.9 million, and not $5.1 million as WMC asserts. Second, the argument ignores the fact that, by the time the accounting action was filed, remaining proceeds had already been distributed to the partners. Regardless of whether it was necessary to look to any partner personally to afford WMC complete relief, it would have been necessary to join those parties in order to recover their distributive shares of the proceeds from the sale of partnership property. Most importantly, examination of the record reveals that throughout the accounting WMC sought far more than $3.757 million. In addition to a $3.33 million claim for reimbursement for absorbing partnership losses, WMC's complaint alleges "WMC further believes that all or a portion of the AHS deeds of trust and other encumbrances against 1143 New Hampshire Avenue, N.W., which were paid solely by WMC should have been treated as liabilities of MHEC, thereby reducing MHEC partners' distributive shares." As recited earlier, the AHS trust deeds secured loans of $2.25 million. Moreover, in answers to an interrogatory attempting to obtain further information concerning WMC's claim for $3.3 million in reimbursable expenses, WMC asserted that its complaint should be amended to cover not only losses for the period from 1973 to 1980, but also for 1971 and 1972, bringing the loss reimbursement claim to a total of $6.375 million. In a memorandum of points and authorities in oppo-

sition to Holle's motion for summary judgment, WMC repeated this figure as the amount of losses incurred by WMC in "active pursuit of prospects for the sale and/or lease of the property ... [which] should have been treated as MHEC losses and/or advances to MHEC for which WMC is entitled to reimbursement...." Finally, in a post-trial brief to Judge Kessler, contrary to counsel for WMC's emphatic assertion at oral argument that WMC was "absolutely not" seeking to recover expenses for servicing the AHS debts, WMC claimed that "WMC and DHI [its wholly owned subsidiary] incurred in excess of $7,000,000 in operational losses in order to sustain the economic potential of the facility. During the life of the Partnership, WMC paid all of the debt service on the Property and kept the Property out of foreclosure." WMC went on to claim a right to reimbursement for "the substantial losses which WMC sustained for the benefit of the MHEC Partnership."

29. In cases where the defendant claims that the filing of an action for an accounting constitutes a fiduciary breach, the trial judge must take care to distinguish the vitriol and recalcitrance that often accompany the dissolution of a partnership from the manifestations of subjective bad faith and evil motive that mark abusive litigation. Uncommendable litigation tactics, although redressable through other means, will not alone support an award of punitive damages absent a showing that they were the product of evil motive or malice. *Zanville v. Garza,* 561 A.2d 1000, 1002 (D.C.1989).

tive damages. Our cases suggest that where outrageous or malicious conduct is the gravamen of the underlying tort, the same conduct can also satisfy the requirement of "aggravation" of the injury, "since it is by definition ... conduct which society finds intolerable, and seeks to deter." *Sere v. Group Hospitalization, supra* note 24, 443 A.2d at 37–38, *citing Harris v. Wagshal, supra,* 343 A.2d at 288 & n. 13 (discussing intentional infliction of emotional distress). We need not decide, however, whether WMC's filing of a groundless lawsuit naming only Holle would support punitive damages without more, because the trial judge based her award upon other actions of WMC as well. As Judge Kessler stated, "[A]ll the facts and allegations in this case, like the pieces of a mosaic, must ultimately be viewed in their totality to discern whether any pattern exists." She found "a clear and consistent pattern of bad faith in [WMC's] dealings with the MHEC partners." In making this finding, she took note of WMC's refusal to remit Holle's distributive share of the proceeds of the sale at the time all other partners were paid, conduct amounting to a separate breach of trust.[30] She found WMC's refusal to recognize Holle's rights to be willful and calculated to punish him for his inquiries into WMC's management practices, pointing to evidence that WMC attempted to condition payment upon Holle's agreement to execute a general release when no other partner was required to sign such a document.[31] All told, the court found WMC's lawsuit to be the culmination of a series of acts marked by refusal to acknowledge Holle's undisputed rights, ef-

forts to exact unwarranted concessions from him, and an intent to coerce him into abandoning his inquiry into WMC's practices. As explained earlier, the required mental state for punitive damages often must be inferred from the totality of the parties' behavior. *Parker, supra,* 557 A.2d at 1322. On this record, we cannot say that the trial court's recognition of a pattern of malice or willful disregard of Holle's rights is unsupported by the evidence. Nor can we say that the amount of damages was excessive or otherwise an abuse of discretion.

### D. Holle's Claim for Post–Petition Rent

We turn lastly to the cross-appeal. As discussed previously, in 1972 Doctors' Hospital, Inc., then lessee of the New Hampshire Avenue property, assigned its leasehold to WMC. From that time forward, WMC stood on both sides of the rental transaction, acting as landlord in its capacity as managing general partner of MHEC, and as tenant in its own behalf. WMC credited MHEC for the monthly rent and debited its own accounts until September 19, 1979, when it filed its petition in bankruptcy, after which these payments ceased. On his cross-appeal, Holle challenges the trial court's denial of his claim for rent accruing between the time WMC filed its bankruptcy petition and the time it sold the building.

Judge Kessler apparently concluded that the debt for rent during this period was discharged by approval of the Plan of Arrangement by the bankruptcy court.[32] She

---

**30.** The court likewise awarded Holle compensatory damages for WMC's failure to pay him interest on his distributive share of the proceeds of the sale.

**31.** Judge Kessler found that WMC's explanation that its insistence on a release was merely "buying its peace" was disingenuous, in light of WMC's concessions before the bankruptcy court that it owed Holle a share of the proceeds in an amount which it did not dispute. She stated: "[W]hatever the merits of the claims being made by Mr. Holle in his [bankruptcy] Complaint and Motions, there was not the slightest question raised by the Defendants about [his] right or the amount to be paid."

**32.** Judge Kessler also held herself bound by a finding entered by another Superior Court judge earlier in the case, ruling on defendants' motion for partial summary judgment, that "there was no duty on the part of Defendants to inform either Holle or the limited partners of the management's decision to undertake the DHI lease." That conclusion seems to relate to Holle's claim that WMC's *non-disclosure* constituted a breach of fiduciary duty or violation of the partnership agreement, but does not address whether the claim for back rent itself was discharged in bankruptcy.

declined to "revisit the legal and factual questions raised in WMC's bankruptcy" as this would contravene the "fresh start" policy represented by a discharge in bankruptcy. Holle contends that the court failed to recognize that the rental obligation came within an exception to the discharge rule for debts undisclosed by the debtor. WMC counters that the exception is inapplicable because WMC disclosed its rental obligation in filings before the bankruptcy court, and rejected the lease pursuant to 11 U.S.C. § 365. In any event, WMC contends, the Superior Court lacked jurisdiction to determine the dischargeability of the debt.

### 1. Jurisdiction

Under ordinary circumstances, confirmation of a plan of arrangement by the bankruptcy court in a chapter 11 case "discharges the debtor from any debt that arose before the date of such confirmation." *Id.* § 1141(d)(1)(A). In addition, it discharges the debtor from a claim arising from "rejection, ... of an executory contract or unexpired lease of the debtor that has not been assumed...." *Id.* §§ 1141(d)(1)(A), 502(g). Despite the broad sweep of a discharge in bankruptcy, eight classes of debts are excluded from its operation. *See* 11 U.S.C. § 35(a) (1976),[33] *currently codified as amended at* 11 U.S.C. § 523(a) (1988); *George Washington Univ. v. Galdi,* 475 A.2d 1130, 1133 (D.C.1984). Prior to 1970, once the bankruptcy court determined that the debtor was entitled to a discharge, issues of nondischargeability arising under § 35(a) typically were decided by state courts in the context of a creditor's action to enforce a prior judgment. *Brown v. Felsen,* 442 U.S. 127, 130, 99 S.Ct. 2205, 2208, 60 L.Ed.2d 767 (1979). In 1970, Congress amended the Act to add section 35(c), which vests exclusive jurisdiction in United States bankruptcy courts to determine whether a debt fell within three of those eight categories: liabilities for obtaining money by false pretenses or false representations, § 35(a)(2); claims arising from fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity, § 35(a)(4); and liabilities for willful and malicious injuries to the person or property of another, § 35(a)(8). Pub.L. No. 91–467, § 7, 84 Stat. 992, *codified at* 11 U.S.C. § 35(e) (1976), *currently codified as amended at* 11 U.S.C. § 523(c) (1988). Section 35(c) reflects a congressional determination that the bankruptcy court have exclusive jurisdiction over certain types of nondischargeability questions and concurrent jurisdiction with nonbankruptcy courts over others. *In re Borbridge,* 81 B.R. 332, 334 (Bankr.E.D.Pa.1988).

Here, Holle invokes § 35(a)(3), which provides:

(a) A discharge in bankruptcy shall release a bankrupt from all his provable debts, whether allowable in full or in part, except such as

(3) have not been duly scheduled in time for proof and allowance, with the name of the creditor if known to the bankrupt, unless such creditor had notice or actual knowledge of the proceedings in bankruptcy[.]

In contrast to the types of debts described above, the determination of dischargeability under this section is "of the type over which the bankruptcy court has concurrent *but not exclusive* jurisdiction." *In re McNeil,* 13 B.R. 743, 747 (Bankr.S.D.N.Y. 1981) (emphasis added). The cases WMC cites are not to the contrary.[34] We con-

---

**33.** Because the 1978 Bankruptcy Reform Act and subsequent amendments effected a number of substantial changes in provisions regarding rejection of unexpired leases, we rely on the provisions of the old Bankruptcy Act and cases decided thereunder for purposes of our analysis in this section. Therefore, citations after this point are to the 1976 edition of the United States Code unless otherwise indicated. We note, however, that the dischargeability and jurisdictional provisions of the old Act discussed are substantially similar under the new Bankruptcy Code.

**34.** *In re Tadych,* 89 B.R. 785 (Bankr.E.D.Wis. 1988), involved a creditor's claim of nondischargeability of a debt under 11 U.S.C. § 523(a)(6) (*willful and malicious injury to* property of another), one of the types of questions over which the bankruptcy court has exclusive jurisdiction. *Id.* at 787. While the court recognized that a dischargeability determination

clude that a state court may determine dischargeability in a creditor's action on the debt when the nondischargeability claim rests on the debtor's failure to disclose a debt under 11 U.S.C. § 35(a)(3), and that the trial court therefore erred in concluding that Holle's claim was foreclosed by the discharge in bankruptcy. *In re Coppi,* 75 B.R. 81, 82 (Bankr.S.D.Iowa 1987). *See also George Washington Univ. v. Galdi, supra,* 475 A.2d at 1133; *In re Barber Indus.,* 30 B.R. 382, 384 (Bankr.M.D.Fla. 1983).

### 2. Rejection of Unexpired Lease

WMC next contends that it had no duty to remit rent to MHEC because it rejected the lease in the chapter 11 proceeding. As noted earlier, a discharge in bankruptcy, in addition to absolving the debtor of liability for debts arising prior to the time the petition is filed, can also relieve him of continuing obligations under executory contracts and unexpired leases. In order to ease the burdens of continuing performance under onerous contracts and leases that may deplete the resources of the estate, *see In re Lovitt,* 757 F.2d 1035, 1041 (9th Cir.), *cert. denied,* 474 U.S. 849, 106 S.Ct. 145, 88 L.Ed.2d 120 (1985), the Bankruptcy Act authorizes a debtor-in-possession in a chapter 11 case, under the supervision of the court, to decide whether to assume or reject such leases. 11 U.S.C. § 713(1) (rejection with permission of the court); *id.* § 757(2) (rejection in plan of arrangement); *Texas Importing Co. v. Banco Popular de Puerto Rico,* 360 F.2d 582, 583–84 (5th Cir.1966). An election to reject a lease is treated as an anticipatory breach, and obligations thereunder, although continuing in nature, are treated as debts arising before the petition in bankruptcy. 11 U.S.C. § 103(c); *In re Miracle Mart,* 278 F.Supp. 861, 863 (S.D.N. Y.), *aff'd,* 396 F.2d 62 (2d Cir.1968). If a contract or unexpired lease is rejected, the lessor assumes the status of a pre-petition creditor. *Id.;* 11 U.S.C. § 753.

During the period between the filing of the petition and the debtor's decision to reject or affirm, however, the lessor occupies "an equivocal position. Until his contract is rejected, he is not a creditor with a provable claim...." *In re Greenpoint Metallic Bed Co.,* 113 F.2d 881, 884 (2d Cir.1940). In a reorganization case, as opposed to a liquidation case, there is no fixed time within which the debtor/trustee must make the election.[35] A lessor wishing to

---

was a "core" proceeding, one which fell within the bankruptcy court's traditional equitable jurisdiction, it made this point to deny the debtors' request for a jury trial on the tort and contract allegations that underlay the "willful and malicious" injury claim. *Id.* at 787–88. Similarly, *In re Aerni,* 86 B.R. 203 (Bankr.D.Neb.1988), involved the jurisdiction of the bankruptcy court to hear a counterclaim arising under state law in a "core" dischargeability proceeding. *Id.* at 205. These decisions, which delineate the jurisdiction of the bankruptcy court to decide related state law claims in a dischargeability proceeding, do not advance WMC's argument that the bankruptcy court has exclusive jurisdiction over all dischargeability claims.

**35.** *See In re American Nat'l Trust,* 426 F.2d 1059, 1064 (7th Cir.1970) (in reorganization case, where goal is rehabilitation of debtor corporation, "trustee is entitled to a reasonable time to make a careful and informed evaluation as to the possible burdens and benefits of an executory contract"); *Texas Importing Co., supra,* 360 F.2d at 584 ("Section 70(b) of Bankruptcy Act (11 U.S.C. § 110(b)) which requires assumption or rejection of ... unexpired leases of real property within 60 days after adjudication is inapplicable in a [reorganization] proceeding"). *But see In re Cochise College Park,* 703 F.2d 1339, 1352–53 (9th Cir.1983) (applying 11 U.S.C. § 110(b) in holding all contracts not assumed within 60 days deemed rejected in a reorganization proceeding). Legislative history to the new Code makes it clear that Congress did not intend the presumption of rejection if the contract was not assumed within 60 days to apply in reorganization cases:

> In a liquidation case, the trustee must assume within 60 days (or within an additional 60 days if the court, for cause, extends the time). If not assumed, the contract or lease is deemed rejected. *In a rehabilitation case, the time limit is not fixed in the bill.* However, if the other party to the contract or lease requests the court to fix a time, the court may specify a time within which the trustee must act.

S.Rep. No. 989, *supra* at 59, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 5845. *See also* 11 U.S.C. § 365(d)(2) (1988) (under new Code in chapter 11 case, unexpired lease may be rejected any time before confirmation of plan, but lessor may request court to fix a time). This clarification is consistent with better authorities interpreting the old Act. *See* Bankr.R. 11–53 (1976), advisory committee's note and citations therein.

bring an end to this potentially prolonged period of uncertainty has a right to petition the court to act, either by requiring assumption or rejection of the lease in the plan of arrangement, 11 U.S.C. § 757(2), or by ordering it rejected, *id.* § 713(1). *See Federal's, Inc. v. Edmonton Inv.*, 555 F.2d 577, 582 (6th Cir.1977) (citation omitted); *In re Greenpoint Metallic Bed, supra,* 113 F.2d at 884.

Yet this right would mean little if the lessor was unaware of his status in the bankruptcy proceeding. Thus, the Bankruptcy Rules oblige the debtor to list, *in addition* to "schedules of all his debts," all executory contracts including unexpired leases. Bankr.R. 11–11 (1976). *See also* 11 U.S.C. § 724 (debtor must list all executory contracts at time petition is filed). Both methods of rejection—by permission of the court or by inclusion in the plan of arrangement—naturally depend on the debtor's disclosure of the lease's existence and the identity of the lessor. The Act provides that the court in a chapter 11 proceeding may permit the debtor to reject executory contracts only "upon notice to the other parties to such contracts." 11 U.S.C. § 713(1); Bankr.R. 11–53 (notice and hearing required). Notice of rejection is also required to parties whose contracts are rejected in the plan of arrangement. *In re Alfar Dairy*, 458 F.2d 1258, 1261 (5th Cir.), *cert. denied*, 409 U.S. 1048, 93 S.Ct. 517, 34 L.Ed.2d 501 (1972); Bankr.R. 11–24(a)(5) (10 day notice to all parties in interest required prior to confirmation of the plan).[36]

■ Here, it is beyond dispute that WMC did not list the lease assignment under which it acted as lessee of the New Hampshire Avenue property since 1972 in its statement of executory contracts and unexpired leases.[37] Consequently, its confirmed Plan of Arrangement did not include that lease among its list of rejected contracts. Nor did the court ever permit WMC, after notice and hearing to MHEC, to reject the lease prior to confirmation of the plan. The effect of WMC's failure to affirmatively reject the lease in either of the two ways provided under the Act was that it continued in force. *In re Innkeepers, supra* note 36, 671 F.2d at 226; *Federal's, Inc., supra,* 555 F.2d at 579; *In re Alfar, supra,* 458 F.2d at 1261–62. A discharge in bankruptcy does not affect an unrejected lease. *Federal's, Inc., supra,* 555 F.2d at 579–80.

### 3. Non-disclosure of the Lease

■ To overcome Holle's argument that the debt was not discharged because WMC failed to disclose it, WMC contends that it listed its obligation as lessee under the assignment in its schedule of debts, and that, even if it was somehow deficient in that regard, Holle had actual notice of the bankruptcy proceedings. *See* 11 U.S.C. § 35(a)(3). WMC proffers what can only be characterized as enigmatic references in certain schedules of debts accompanying its petition, and other documents showing that Holle was at least constructively aware of the lease assignment in time to file proof of a claim prior to confirmation.

As regards the references in the schedules, we note that they are inherently ambiguous as to whether WMC was obliged to pay rent to MHEC in its capacity as lessor's agent holding rent on behalf of the

---

**36.** This is so because in chapter 11 proceedings under the old Act, rejection of a contract could not be tacit or implied from non-action by the debtor; some form of action by the court was required. *See In re Innkeepers of New Castle,* 671 F.2d 221, 226 (7th Cir.), *cert. denied,* 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982); *Federal's, Inc., supra,* 555 F.2d at 579; *In re Alfar, supra,* 458 F.2d at 1261–62; *In re American Nat'l Trust, supra,* 426 F.2d at 1064.

**37.** Paragraph 21 of WMC's statement of executory contracts discloses the original lease between it "as landlord" and DHI "as tenant."

This masked the true state of affairs by suggesting to all who read the statement that *DHI,* not *WMC,* was the prime tenant under the lease when the bankruptcy petition was filed, when in fact DHI's obligations and leasehold interest had been entirely assumed by WMC. As Holle's counsel noted in oral argument, the omission to mention the assignment is made all the more glaring by WMC's disclosure, in the immediately preceding paragraph, of its assumption of the obligations of a lease of telephone equipment from RCA Corporation to the Metropolitan Hotel.

partnership or rather, as prime tenant,[38] and that they respond to the request on the form on which they appear for *prepetition* rental obligations. Continuing obligations under an unexpired lease, as discussed above, are treated differently under the Act. Both the statute, 11 U.S.C. § 724, and Bankr.R. 11–11 unequivocally require the debtor to list executory contracts on an appropriate form. Because a lessor does not become a creditor with a provable claim until the lease is rejected in the manner specified in the Act—and only then has an opportunity to participate in the proceeding as a creditor—it is not unreasonable to demand strict compliance with requirements designed to put such lessors on notice of the need to do what is necessary to be deemed a creditor. In these circumstances, as the court in *In re Alfar Dairy* noted in an analogous context, "[i]nformal, ad hoc compliance with the general contours of the Act is not sufficient." 458 F.2d at 1261.

As WMC points out, there is an exception to nondischargeability of undisclosed debts when the creditor has notice or actual knowledge of the proceedings in bankruptcy, and Holle does not dispute that he, at least, had actual knowledge of WMC's petition the day after it was filed. 11 U.S.C. § 35(a)(3). This exception reflects the due process underpinnings of section 35(a)(3).

It recognizes that a discharge in bankruptcy is a property deprivation accomplished through the offices of the court, but that a creditor's actual knowledge of the commencement of bankruptcy proceedings affords him sufficient notice of the need to participate in those proceedings in order to protect his interest. The exception, however, does not address the due process problem that arises when a discharge extinguishes the property interest of a creditor having no notice that he *has* an interest.

While Holle had notice of the *proceedings*, and moved to vindicate other interests in need of protection, because of the unusual circumstances of this case—where WMC maintained all partnership books and records, acted as both tenant and agent for the landlord, and paid the rent by means of "paper" transfers between itself and the partnership—Holle was *unaware of WMC's status as prime tenant*, and of the need to force rejection of the lease in order to claim the status of a creditor.[39] As the United States Supreme Court held in rejecting the argument that knowledge of the bankruptcy proceeding put a lienholder on notice of the deadline for filing its proof of claim:

The argument is that such knowledge puts a duty on creditors to inquire for themselves about possible court orders

---

**38.** These schedules identify the creditor as "MHEC Partnership c/o Wash. Med. Ctr., Inc."

**39.** Holle could reasonably be expected to have moved to vindicate his rights under the lease at or about the same time he raised his allegations concerning the AHS deeds of trust only if it appears that he learned of the fact of the assignment at the same time. We note that Holle made reference to the AHS deeds of trust, and alleged that the debts underlying them were incurred on WMC's behalf, in a complaint to determine priority of lien filed in December 1980, and filed a motion to set aside the Plan of Arrangement based on the same facts on April 24, 1981. In contrast, Holle testified that he acquired actual knowledge of the existence of the assignment only sometime in May 1981, after his accountant completed his review of WMC's books and records and issued his report. This was five months after the December 3, 1980 confirmation of the Plan.

A creditor seeking to modify a confirmed plan to accommodate his claim faces a difficult burden. After confirmation, the bankruptcy court retains very limited jurisdiction to modify the

plan; such power is confined only to addressing matters specifically reserved in the plan, 11 U.S.C. § 768, or to resolving claims that confirmation was procured by fraud. *Id.* § 786. And even a claim of fraud is barred unless an application for modification is filed within six months of confirmation. *Id.* Few procedural options beyond these are available. *See, e.g., Federal's, Inc., supra,* 555 F.2d at 582–83 (court rejected debtor's claim that confirmed plan should have been modified under Fed.R.Civ.P. 60(b) to permit it to reject an unexpired lease).

On the record before us, there is substantial doubt as to whether Holle received notice of the existence of the assignment in sufficient time to attempt to seek its rejection and thereby acquire the status of a creditor. In these circumstances, to allow a debtor to place a potential creditor in the difficult position of having to seek modification of a confirmed plan by the debtor's own failure to adhere to clear and mandatory notice requirements would be inconsistent with the purposes of the Bankruptcy Act.

limiting the time for filing claims. *But even creditors who have knowledge of a reorganization have a right to assume that the statutory "reasonable notice" will be given to them before their claims are forever barred ... [A] rea-*sonable opportunity to be heard must precede judicial denial of a party's claimed rights. *New York v. N.Y., N.H. & H.R. Co.*, 344 U.S. 293, 297, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953). Observance of the provisions of the Act and Rules requiring disclosure of unexpired leases, in the circumstances of this case, would have put Holle and the MHEC partners on notice of the very existence of a claim against WMC, and afforded them the "reasonable opportunity to be heard" that must precede extinction of those rights. Strict compliance with notice provisions is central to the reorganization scheme: "[t]he importance of creditor participation in reorganization proceedings ... coupled with the practical dangers to substantive creditor rights posed by the lack of such participation, will admit of no other conclusion." *In re Intaco Puerto Rico*, 494 F.2d 94, 99 (1st Cir.1974) (citation omitted). In evaluating WMC's citations, we do not believe that the references to a "sublease" upon which it relies can substitute for the fair notice to Holle or any of the MHEC partners of WMC's status as prime tenant under the lease which the Act contemplates.

In sum, we conclude that the post-petition, pre-sale lease obligation was not discharged in bankruptcy because WMC failed to list the assignment as an unexpired lease and failed to reject it in accordance with the provisions of the Act. We accordingly remand the cross-appellants' claim for rent to the trial court for a determination of damages.

### III. Conclusion

The judgment is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

*So ordered.*